UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATRICK BOWIE,

                         Petitioner,

     v.

WILLIAM LEE, Superintendent, Green
Haven Correctional Facility,

                        Respondent.

No. 13-CV-7317 (KMK) (PED)

ORDER ADOPTING REPORT &
RECOMMENDATION

Appearances:

Patrick Bowie
Stormville, NY
*Pro Se Petitioner*

Andrew R. Kass, Esq.
Orange County District Attorney's Office
Goshen, NY
*Counsel for Respondent*

KENNETH M. KARAS, United States District Judge:

        Patrick Bowie ("Petitioner"), proceeding pro se, has filed a Petition for a Writ of Habeas

Corpus (the "Petition"), pursuant to 28 U.S.C. § 2254, challenging his August 30, 2007

conviction, following a jury trial in New York Supreme Court, Orange County ("County Court"),

for two counts of Murder in the First Degree, four counts of Robbery in the First Degree, one

count of Criminal Possession of a Weapon in the Second Degree, and one count of Conspiracy in

the Second Degree.  (*See generally* Pet. for Writ of Habeas Corpus ("Pet.") (Dkt. No. 1).)

        Petitioner timely filed a direct appeal of his conviction to the New York Supreme Court,

Appellate Division, Second Department ("Second Department"), which affirmed the conviction

on April 5, 2011.  *See People v. Bowie*, 919 N.Y.S.2d 893 (2d Dep't 2011).  The New York

Court of Appeals ("Court of Appeals") denied Petitioner's motion for leave to appeal on July 26, 2011, *see People v. Bowie*, 17 N.Y.3d 804 (2011), and denied Petitioner's motion for reconsideration of that denial on July 16, 2012, *see People v. Bowie*, 19 N.Y.3d 971 (2012).

On October 15, 2013, Petitioner moved before the County Court to vacate his conviction pursuant to New York Criminal Procedure Law ("NY CPL") § 440.10 ("First 440.10 Motion"), which the County Court denied on July 30, 2014.  (*See* Resp't's Mem. of Law in Opp'n to Pet. ("Resp't's Opp'n") (Dkt. No. 89) Exs. 40 & 44.)[1]  The Second Department denied Petitioner's motion for leave to appeal on February 20, 2015, (*see* Resp't's Opp'n Ex. 48), and the Court of Appeals denied Petitioner's motion for leave to appeal on May 25, 2015, *see People v. Bowie*, 25 N.Y.3d 1069 (2015).  The County Court denied Petitioner's motion for reconsideration on December 9, 2015, (*see* Resp't's Opp'n Ex. 56), and the Second Department denied Petitioner's motion for leave to appeal the denial of his motion for reconsideration on March 9, 2016, (*see* Resp't's Opp'n Ex. 59).  Petitioner had also attempted to appeal the County Court's denial of his motion for reconsideration as of right; the Second Department dismissed this appeal as improper on March 29, 2016.  (*See* Resp't's Opp'n Ex. 60.)  On June 29, 2016, the Court of Appeals dismissed Petitioner's application for leave to appeal the Second Department's March 9, 2016 Order, *see People v. Bowie*, 27 N.Y.3d 1128 (2016); the Court of Appeals denied Petitioner's motion for reconsideration of that dismissal on November 1, 2016, *see People v. Bowie*, 28 N.Y.3d 1071 (2016).

---

[1] Respondent filed the 77 exhibits attached to his Opposition in 13 volumes, each of which is a compilation of exhibits.  (*See* Dkt. Nos. 90-1–90-13.)  The Court will refer to these exhibits by the exhibit numbers assigned by Respondent, who has helpfully provided an index indicating which exhibits appear in which volumes.  (*See* Resp't's Opp'n ii–vii.)  Where possible, the Court will refer to the exhibit's native pagination.  Where the exhibit is not natively paginated, the Court will refer to the page numbers stamped at the top-right corner of each page by Respondent, unless otherwise noted.

On May 23, 2017, Petitioner filed a petition for a Writ of Error Coram Nobis ("Coram Nobis Petition") before the Second Department, (*see* Resp't's Opp'n Ex. 63), which denied it on December 6, 2017, *see People v. Bowie*, 64 N.Y.S.3d 607 (2d Dep't 2017).  The Court of Appeals denied Petitioner's application for leave to appeal the Second Department's denial on March 15, 2018, *see People v. Bowie*, 31 N.Y.3d 981 (2018), and denied Petitioner's motion to reconsider that denial on May 16, 2018, *see People v. Bowie*, 31 N.Y.3d 1079 (2018).  The Second Department denied Petitioner's motion for leave to reargue his Coram Nobis Petition on May 17, 2018.  (*See* Resp't's Opp'n Ex. 73.)

Petitioner filed a supplemental brief in support of the Petition ("Petitioner's Supplemental Brief") on January 14, 2019.  (*See* Suppl. Br. Relief from J. ("Pet'r's Suppl. Br.") (Dkt. No. 80).) Respondent filed a Memorandum of Law opposing the Petition, as supplemented, on May 6, 2018.  (*See* Aff. in Opp'n to Pet. ("Resp't's Aff.") (Dkt. No. 88); Resp't's Opp'n; *see also* Dkt. No. 90 (attaching exhibits and transcripts).)  Petitioner filed a Memorandum of Law in reply to Respondent's Opposition ("Petitioner's Reply") on August 12, 2019.  (*See* Reply to Resp't's Answer for a Writ of Habeas Corpus ("Pet'r's Reply") (Dkt. No. 103).)

In a thorough Report and Recommendation ("R&R") dated May 14, 2021, Magistrate Judge Paul E. Davison ("Judge Davison") recommended that the Petition be denied in its entirety.  (*See* Report & Recommendation ("R&R") 1 (Dkt. No. 120).)  Petitioner filed Objections to the R&R on August 3, 2021, after seeking and receiving an extension of time to object.  (*See* Pet'r's Obj's to R&R ("Obj's") (Dkt. No. 132).)  Respondent has not responded to the Objections.  After a review of the R&R and Petitioner's Objections, the Court adopts the result recommended in the R&R and denies the Petition.

## I.  Background

The factual and procedural background of this case is set forth in the R&R and the Court assumes the Parties' familiarity therewith.  (*See* R&R 1–18.)  The Court nevertheless summarizes the relevant facts and procedural history.

### A.  Factual Background

Fermina Nunez ("Nunez") and Petitioner had been in a romantic relationship for several years when in September 2006, Petitioner moved his ex-wife and their child into his home in Middletown, NY, leading Nunez to break off her relationship with Petitioner.  (Resp't's Opp'n 2.)  In the months that followed, Petitioner went to great lengths to resume his relationship with Nunez, including visiting Nunez at her place of work (the Final Touch Salon in Middletown, which Nunez also owned) on numerous occasions, calling Nunez on the phone over 1,000 times, contacting Nunez's brothers and children, and even offering one of Nunez's brothers $10,000 to $15,000 to persuade Nunez to resume the relationship.  (*Id.* at 2–3, 5.)

Beginning in December 2006, Petitioner began to make dozens of calls to Melvin Green ("Green"), an old friend of Petitioner's, and on December 19, Petitioner visited Green at his apartment in the Bronx.  (*Id.* at 5–7.)  After their December 19 meeting, Green turned off his phone—making and receiving zero calls—until December 25, when Petitioner resumed his calls to Green.  (*Id.* at 5.)  On that same day, Petitioner visited Green's apartment again, and the two spoke behind closed doors for approximately 45 minutes.  (*Id.* at 5–6.)

On December 30, 2006, Petitioner visited Nunez at the Final Touch Salon several times, and the two had a verbal argument that was witnessed by Nunez's employees and salon patrons. (*Id.* at 3.)  Nunez told Petitioner that the relationship was over, and Petitioner responded by

telling Nunez that she would be sorry and both she and her family would know "what he was capable of." (*Id.*)

The salon stayed open late on December 30 to accommodate patrons who wanted to style their hair for New Year's Eve; at 11:00pm, Nunez was still at the salon with two of her employees, Deborah Carabello ("Carabello") and Milagros Picon ("Picon"), and a patron, Esther Deslandes ("Deslandes"). (*Id.*) At around 11:45pm, Green entered the salon wearing a New York Yankees baseball cap, a dark leather jacket, jeans, and Timberland work boots, with his face uncovered, and armed with an old, chipped, black-brown .38-caliber revolver. (*Id.* at 4.) Green brandished the revolver at Nunez, Carabello, Picon, and Deslandes, and demanded all of their cash and valuables. (*Id.*) After the women complied, Green asked for the owner of the salon, and compelled Nunez to open the cash register. (*Id.*) After removing the cash from the register, Green forced Nunez to the ground, stepped on the back of Nunez's leg, fired a single shot from the revolver directly into the back of Nunez's head, and fled the scene. (*Id.*) Nunez died almost instantly. (*Id.*) Petitioner and Green spoke on the phone 91 times between December 28 and 30; the final communication between the two was a call from Green to Petitioner at almost the exact minute that a 911 call was made to Orange County Police following Nunez's murder. (*Id.* at 5–6.) Thereafter, Petitioner and Green had no further telephone contact. (*Id.* at 6.)

Police officers from the City of Middletown Police Department responded to the scene and quickly identified Petitioner as a suspect based on interviews with friends and witnesses to Petitioner's argument with Nunez earlier that day. (*Id.* at 4–5.) Responding officers also found small pieces of potatoes at the crime scene among the blood splatters, which indicated to police that the shooter may have attempted to use a potato as a homemade silencer. (*Id.* at 5, 19.)

On December 31, 2006, Petitioner voluntarily visited the Middletown Police Department with his attorney and met with two detectives.  (Resp't's Aff. 2–3.)  Petitioner recounted his romantic history with Nunez, and stated that he was at home the night of December 30 when he received a phone call from his sister that something had happened to Nunez.  (*Id.* at 3; Resp't's Opp'n 7.)  Petitioner told police that after he learned of Nunez's death, he contacted his attorney. (*Id.*)  The detectives observed that Petitioner's demeanor during the interview was overly calm and affectless; moreover, Petitioner did not indicate that he had contacted Nunez's family following her murder to send his condolences.  (Resp't's Opp'n 7.)

After identifying Petitioner as a potential suspect, police had swiftly obtained access to Petitioner's phone records.  (Resp't's Aff. 3.)  The phone records quickly led police to Green, who was identified by eyewitnesses as the shooter; Green was then arrested on January 1, 2007. (*Id.*)  After his arrest, Green confessed both to the murder and to being paid by Petitioner to carry it out, and while he was being booked at the Orange County Jail, police recovered a pair of Timberland boots that matched a footprint found on the back of Nunez's pants.  (*Id.*; *see also* Resp't's Opp'n Ex. 75, Ex. 6.)[2]  Green also indicated that the murder weapon was in his Bronx apartment.  (Resp't's Aff. 3.)

On January 2, 2007, Petitioner was arrested and charged with Nunez's murder.  (Resp't's Opp'n 7.)  When police arrived at Petitioner's home to execute the arrest warrant, Petitioner had multiple stab wounds in his neck, arms, and groin, which Petitioner admitted were self-inflicted. (*Id.* at 7–8; Resp't's Aff. 4.)  After Petitioner was taken into custody, police executed a search

---

[2] Exhibit 75 to Respondent's Opposition is the prosecution's opposition to Petitioner's Second 440.10 Motion, *see infra*, which itself includes a number of exhibits, organized numerically.  When citing to the exhibits to the prosecution's opposition to Petitioner's Second 440.10 Motion, the Court will refer to the exhibits' native numbering and pagination.

warrant of Petitioner's home, in which they observed a pool of blood on the floor, two knives, and potatoes in a wire basket in the kitchen. (Resp't's Opp'n 8.) That same day, police executed a search warrant at Green's home, where they recovered another pair of Timberland boots, a pair of jeans, a black leather jacket with $45 in cash in a pocket, several cell phones, a New York Yankees baseball cap, and a .38-caliber revolver with a defaced serial number and one spent shell casing wrapped in a towel. (*Id.*; Resp't's Aff. 3–4.)

Petitioner and Green were charged in a joint indictment on February 6, 2007 with two counts of Murder in the First Degree, two counts of Murder in the Second Degree, four counts of Robbery in the Second Degree, one count of Criminal Possession of a Weapon in the Second Degree, and one count of Conspiracy in the Second Degree. (Resp't's Opp'n Ex. 1.) Green was also charged with an additional count of Criminal Possession of a Weapon in the Second Degree. (*Id.*)

Following their indictment, Petitioner and Green were both held at the Orange County Jail, and though they were housed separately, the two corresponded via letters passed through a fellow inmate named Marlon Avila ("Avila"). (Resp't's Opp'n 8.) On July 24, 2007, Avila turned over a sample of those letters to the Orange County District Attorney's Office via his attorney. (*Id.*) Police executed search warrants in both Petitioner and Green's cells two days later, and recovered additional letters. (*Id.*) Though the letters were written in "code," the code is rudimentary and easily understandable in context. (*Id.* at 8–9.) The letters are also inculpatory. (*See* Resp't's Opp'n Ex. 10.) In the letters, among other things, Petitioner and Green attempt to fashion a cohesive alibi to explain their many calls and Green's presence in Middletown. (*See id.*) Green also complains to Petitioner about Petitioner's failure to pay him "ten jelly beans for the party," and Petitioner implores Green to execute a new affidavit claiming

that his post-arrest confession was false and the result of police coercion.  (*Id.* at 112–16, 133–34; *see also* Resp't's Opp'n 10.)

At trial, the prosecution introduced copious evidence, including Petitioner's cell phone records, the letters, and testimony from 33 witnesses.  (Resp't's Aff. 5–6; Pet., Dkt. No. 1 at 12.)[3] Moreover, DNA analysis revealed traces of Petitioner's and Green's DNA on the towel in which police found the .38-caliber revolver wrapped in Green's home.  (Resp't's Opp'n 10.)  Nunez's brother also identified the revolver as belonging to Petitioner, and eyewitnesses identified the revolver as the murder weapon.  (*Id.* at 11.)  Further, ballistics analysis demonstrated that the bullet recovered from Nunez's head could have been shot from the .38-caliber revolver, and other evidence demonstrated that the boot impression on Nunez's pant leg was consistent with the size and tread design of the Timberland boots recovered from Green.  (*Id.* at 10.)  Finally, Petitioner's financial records also showed that a $10,000 withdrawal had been made in December 2006, and that the handwriting on Petitioner's bank records matched the handwriting in the letters provided to prosecutors by Avila and found in Petitioner's jail cell.  (*Id.*)  Petitioner offered testimony from four other witnesses in his case-in-chief, but—as relevant to the instant Objections—did not offer any expert testimony, though the County Court had authorized defense counsel to retain a firearms and ballistics expert and a DNA analysis expert at public expense. (*See id.* at 11–12; Resp't's Opp'n Ex. 74, Ex. E.)[4]

---

[3] The Petition was filed across two docket entries, and contains Petitioner's appellate brief to the Second Department as support for Petitioner's weight of the evidence and sufficiency of the evidence claims.  When citing to the Petition, the Court refers to the document's native paragraph numbering.  When citing to the brief slotted into the middle of the Petition, the Court refers to the docket number containing the relevant page and the ECF-stamped page numbers at the top right-hand corner of each page.

[4] Exhibit 74 to Respondent's Opposition is Petitioner's Second 440.10 Motion, *see infra*, which itself includes a number of exhibits, organized alphabetically.  When citing to the exhibits

On August 30, 2007, the jury convicted Petitioner of two counts of Murder in the First Degree, four counts of Robbery in the First Degree, one count of Criminal Possession of a Weapon in the Second Degree, and one count of Conspiracy in the Second Degree.  (Resp't's Aff. 6.)

### B.  Appellate Procedural History

Petitioner timely appealed his conviction to the Second Department, filing both a brief via his appellate counsel on May 8, 2009, and a supplemental brief pro se on August 13, 2010.  (*See* Resp't's Opp'n Exs. 12, 16.)  In his first appellate brief, filed via appellate counsel, Petitioner argued (1) that the evidence presented at trial was insufficient to support the verdict; and (2) that the verdict was against the weight of the evidence.  (Resp't's Opp'n Ex. 12.)  In his second appellate brief, filed pro se, Petitioner argued (1) that the County Court erred in admitting his bank records over trial counsel's objection; (2) that the County Court erred in admitting the letters recovered from Petitioner's jail cell, since police violated the cell search warrant in seizing the letters; (3) that his trial counsel's decision not to present Green's affidavit (presumably, the affidavit revising his confession) to the jury denied Petitioner his right to a fair trial; and (4) that the prosecution failed to meet its burden of proof as to an agreement or payment between Petitioner and Green, and thus, that the indictment should have been dismissed.  (Resp't's Opp'n Ex. 16.)[5]  On April 5, 2011, the Second Department affirmed

_____

to Petitioner's Second 440.10 Motion, the Court will refer to the exhibits' native lettering and pagination.

[5] These four grounds for relief constitute the questions presented in Petitioner's statement made pursuant to § 5528(a)(2) of the New York Civil Practice Law and Rules ("NY CPLR").  Liberally construed, Petitioner also raised additional grounds for relief in the brief itself, including that the County Court failed to properly instruct the jury on the use of circumstantial evidence and that the County Court erred in admitting certain evidence and allowing certain testimony (though precisely what evidence and what testimony is not clear).  (Resp't's Opp'n Ex. 16.)

Petitioner's conviction, holding that "[Petitioner's] challenge to the legal sufficiency of the evidence supporting is unpreserved for appellate review," and "[i]n any event, . . . [the evidence] was legally sufficient to establish [Petitioner's] guilt beyond a reasonable doubt." *Bowie*, 919 N.Y.S.2d at 894. The court was further "satisfied that the verdict of the guilt was not against the weight of the evidence," and found Petitioner's "remaining contentions" to be "without merit." *Id.* The Court of Appeals denied Petitioner's motion for leave to appeal on July 26, 2011, *see Bowie*, 17 N.Y.3d at 804, and denied Petitioner's motion for reconsideration of that denial on July 16, 2012, *see Bowie*, 19 N.Y.3d at 971.

On October 8, 2013, Petitioner timely filed the Petition, in which he raised four grounds for relief. (*See* Pet.) However, Petitioner acknowledged that two of the grounds for relief raised in the Petition were unexhausted—his claims of ineffective assistance of trial counsel and ineffective assistance of appellate counsel—and sought an order staying the proceedings and holding the Petition in abeyance to allow him to exhaust those claims. (*See id.*) Judge Davison granted Petitioner's request, and entered a stay on March 21, 2014. (*See* Order (Dkt. No. 12).)

Petitioner filed his First 440.10 Motion pro se on October 15, 2013, appearing to argue (1) that his trial counsel provided ineffective assistance by (a) "fail[ing] to investigate and prepare" for trial by "failing to contact . . . and/or prepare" certain unidentified witnesses to testify on Petitioner's behalf, (b) failing to retain a DNA analysis expert witness to testify on Petitioner's behalf, (c) failing to object to Green's presentment for identification at trial in an orange prison jumpsuit, and (d) failing to object to the introduction of the letters recovered from his jail cell, since the introduction of the letters violated his Sixth Amendment Confrontation Clause right where neither Avila nor Avila's attorney was called to testify; (2) that Petitioner was "actually and factually innocent of" the charges brought against him; and (3) that in "deliberately

10

mislead[ing] the jury into believing that certain money transactions were utilized to pay for the commission of a crime when these funds were exclusively used to conduct legal business transactions," the prosecution engaged in misconduct.  (Resp't's Opp'n Ex. 40.)  The County Court denied Petitioner's First 440.10 Motion on July 30, 2014, explaining (1) Petitioner failed to provide any evidence, "let alone clear and convincing evidence," to establish his "actual innocence"; (2) that Petitioner provided no evidence "other than his conclusory allegations" in support of his claim of ineffective assistance of counsel; and (3) that Petitioner's claims "regarding errors at trial are matters of record and therefore could have been or were previously raised on appeal," and thus, were ineligible for relief pursuant to NY CPL § 440.10.  (Resp't's Opp'n Ex. 44.)  The Second Department and Court of Appeals both denied Petitioner's motions for leave to appeal the County Court's ruling on his First 440.10 Motion, (*see* Resp't's Opp'n Ex. 48); *see also Bowie*, 25 N.Y.3d at 1069, and the County Court denied Petitioner's motion for reconsideration, (*see* Resp't's Opp'n Ex. 56).  The Second Department then denied Petitioner's motion for leave to appeal the County Court's denial of Petitioner's motion for reconsideration and dismissed Petitioner's attempt to appeal the denial as of right.  (*See* Resp't's Opp'n Exs. 59, 60.)  Finally, the Court of Appeals dismissed Petitioner's application for leave to appeal from the Second Department's denial of his motion for leave to appeal the County Court's denial of his motion for reconsideration, *see Bowie*, 27 N.Y.3d at 1128, and denied Petitioner's motion for reconsideration of that dismissal, *see Bowie*, 28 N.Y.3d at 1071.

On November 22, 2016, Respondent moved to lift the stay on the basis that Petitioner had fully exhausted his state court remedies, (*see* Dkt. No. 32), which Judge Davison denied, instructing Petitioner to file a petition for Writ of Error Coram Nobis, (*see* Dkt. No. 33).

On May 23, 2017, Petitioner filed his Coram Nobis Petition, arguing that his appellate counsel was ineffective for failing to argue in his direct appeal (1) that trial counsel was ineffective for (a) failing to object to "the testimony concerning the notes written by . . . Avila," (b) failing to object to the County Court's admittance of the letters seized in the cell search, (c) failing to object to Green's presentment for identification wearing an orange jumpsuit, (d) failing to utilize the services of expert witnesses; and (e) "failing to rebut the prosecution's conspiracy theory," which Petitioner argued was established via introduction of evidence concerning Petitioner's $10,000 withdrawal in December 2006; and (2) that Petitioner's constitutional right to a fair trial was violated by the introduction of testimony from a police investigator concerning cell tower data.  (Resp't's Opp'n Ex. 63.)  The Second Department summarily denied Petitioner's Coram Nobis Petition on December 6, 2017, explaining simply that Petitioner "failed to establish that he was denied the effective assistance of appellate counsel."  *Bowie*, 64 N.Y.S.3d at 608.  The Court of Appeals denied Petitioner's application for leave to appeal the Second Department's denial of his Coram Nobis Petition on March 15, 2018, *see Bowie*, 31 N.Y.3d at 981, and denied Petitioner's motion to reconsider that denial on May 16, 2018, *see Bowie*, 31 N.Y.3d at 1079.  The Second Department denied Petitioner's motion for leave to reargue his Coram Nobis Petition on May 17, 2018.  (*See* Resp't's Opp'n Ex. 73.)

By letters to this Court dated May 24 and 29, 2018, Petitioner requested that the stay remain in place despite his exhaustion of his ineffective assistance of trial counsel and ineffective assistance of appellate counsel claims, asserting that he had either "new" or "newly discovered" evidence that he wished to present to the state court in a new NY CPL § 440.10 motion.  (*See* Dkt. Nos. 51, 52.)  On June 5, 2018, Judge Davison entered an Order to Show Cause, ordering Petitioner to show cause as to why the Court should not lift the stay.  (*See* Order (Dkt. No. 54).)

On July 2, 2018, Petitioner filed a second motion to vacate his conviction pursuant to NY CPL § 440.10 ("Second 440.10 Motion"), reasserting many arguments that he had previously raised in other post-conviction proceedings.  (*See* Resp't's Opp'n Ex. 74.)  Petitioner appears to have raised one new ground for relief: that the prosecution committed a *Brady* violation by "deliberately with[olding] certain portions of [Petitioner's] bank records that would have contradicted the prosecut[ion]'s theory."  (*Id.* (underlining omitted).)  Petitioner submitted his Second 440.10 Motion to this Court in response to Judge Davison's June 5, 2018 Order to Show Cause.  (*See* Dkt. No. 70.)  By order dated November 30, 2018, Judge Davison concluded that any claims raised in his Second 440.10 Motion did not correspond to the claims set forth in the Petition, and lifted the stay.  (*See* Order 3 (Dkt. No. 69) ("The purpose of the stay was to allow Petitioner to exhaust the ineffective assistance claims . . . set forth in his petition.  He has now done so.  Under these circumstances, a further stay to accommodate Petitioner's desire to pursue additional remedies in the state courts would constitute an abuse of discretion under [*Rhines v. Weber*, 544 U.S. 269 (2005)]." (citation omitted)).)

Petitioner filed Petitioner's Supplemental Brief on January 14, 2019.  (*See* Pet'r's Suppl. Br.)  Judge Davison issued the R&R on May 14, 2021, recommending that the Petition be denied in its entirety.  (*See* R&R 1.)  Petitioner subsequently filed the Objections.  (*See* Obj's.)[6]

---

[6] The Objections were docketed across multiple docket entries.  (*See* Dkt. Nos. 132–132-1.)  However, the Objections retain the document's native pagination.  When citing to the Objections, the Court will refer to the document's native pagination.

## II.  Discussion

### A.  Applicable Law

#### 1.  Review of a Magistrate Judge's R&R

A district court reviewing a report and recommendation addressing a dispositive motion "may accept, reject, or modify, in whole or in part, the findings or recommendations made by [a] magistrate judge."  28 U.S.C. § 636(b)(1).  Under 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b), a party may submit objections to the magistrate judge's report and recommendation.  The objections must be "specific" and "written," FED. R. CIV. P. 72(b)(2), and must be made "[w]ithin 14 days after being served with a copy of the recommended disposition," *id.*; *see also* 28 U.S.C. § 636(b)(1), plus an additional three days when service is made pursuant to Federal Rules of Civil Procedure 5(b)(2)(C)–(F), *see* FED. R. CIV. P. 6(d), for a total of seventeen days, *see* FED. R. CIV. P. 6(a)(1).

Where a party submits timely objections to a report and recommendation, as Petitioner has done here, the Court reviews de novo the parts of the report and recommendation to which the party objected.  *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b)(3).  The district court "may adopt those portions of the . . . report [and recommendation] to which no 'specific written objection' is made, as long as the factual and legal bases supporting the findings and conclusions set forth in those sections are not clearly erroneous or contrary to law."  *Eisenberg v. New Eng. Motor Freight, Inc.*, 564 F. Supp. 2d 224, 226 (S.D.N.Y. 2008) (quoting FED. R. CIV. P. 72(b)(2)).

Finally, pleadings submitted by pro se litigants are held to a less strict standard than those drafted by attorneys.  *See Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 402 (2008) ("Even in the formal litigation context, pro se litigants are held to a lesser standard than other parties."

(italics omitted)).  Because Petitioner is proceeding pro se, the Court construes his pleadings "to

raise the strongest arguments that they suggest."  *Triestman v. Fed. Bureau of Prisons*, 470 F.3d

471, 474 (2d Cir. 2006) (per curiam) (italics and quotation marks omitted).  However, this "does

not exempt a [pro se litigant] from compliance with relevant rules of procedural and substantive

law."  *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983) (quotation marks omitted).

### 2.  Standard of Review

Petitions for writs of habeas corpus are governed by the Antiterrorism and Effective

Death Penalty Act of 1996 ("AEDPA"), which provides that a state prisoner may seek habeas

corpus relief in federal court "on the ground that he is in custody in violation of the Constitution

or laws . . . of the United States."  28 U.S.C. § 2254(a).

> The writ may not issue for any claim adjudicated on the merits by a state court
> unless the state court's decision was "contrary to, or involved an unreasonable
> application of, clearly established Federal law as determined by the Supreme Court
> of the United States," or was "based on an unreasonable determination of the facts
> in light of the evidence presented in the State Court proceeding."

*Epps v. Poole*, 687 F.3d 46, 50 (2d Cir. 2012) (quoting 28 U.S.C. § 2254(d)(1)–(2)).  In this

context, "it is the habeas applicant's burden to show that the state court applied [federal law] to

the facts of his case in an objectively unreasonable manner."  *Woodford v. Visciotti*, 537 U.S. 19,

25 (2002) (per curiam); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("The petitioner

carries the burden of proof.").

A decision is "contrary to" clearly established Federal law if (1) "the state court applies a

rule that contradicts the governing law set forth in [Supreme Court] cases," or (2) "the state court

confronts a set of facts that are materially indistinguishable from a decision of [the Supreme]

Court and nevertheless arrives at a result different from [Supreme Court] precedent."  *Williams v.*

*Taylor*, 529 U.S. 362, 405–06 (2000).  A decision is "an unreasonable application of clearly

established Federal law" if a state court "correctly identifies the governing legal rule but applies

it unreasonably to the facts of a particular prisoner's case." *Id.* at 407–08 (alterations and quotation marks omitted). "Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of th[e Supreme] Court's decisions. And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014) (citations and quotation marks omitted); *see also id.* at 420 (noting that a petitioner must show a state court ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement" (quotation marks omitted)); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.").

"Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quotation marks omitted). Consequently, a federal court must deny a habeas petition in some circumstances even if the court would have reached a conclusion different than the one reached by the state court, because "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102; *see also Cullen*, 563 U.S. at 202–03 ("Even if the [Federal] Court of Appeals might have reached a different conclusion as an initial matter, it was not an unreasonable application of our precedent for the [state court] to conclude that [the petitioner] did not establish prejudice."); *Hawthorne v. Schneiderman*, 695 F.3d 192, 197 (2d Cir. 2012) ("Although we might not have decided the issue in the way that the [New York State] Appellate Division did—and indeed we are *troubled by the outcome we are constrained to reach—*

we . . . must defer to the determination made by the state court . . . ." (emphasis added) (citation omitted)).

Additionally, under AEDPA, the factual findings of state courts are presumed to be correct.  *See* 28 U.S.C. § 2254(e)(1); *Nelson v. Walker,* 121 F.3d 828, 833 (2d Cir. 1997) ("When reviewing a habeas petition, the factual findings of the New York Courts are presumed to be correct." (alteration and quotation marks omitted)).  The petitioner must rebut this presumption by "clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see also Cotto v. Herbert*, 331 F.3d 217, 233 (2d Cir. 2003) (same).

Finally, only Federal law claims are cognizable in habeas proceedings.  "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *see also* 28 U.S.C. § 2254(a) ("The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.").

### 3.  Procedural Requirements for Habeas Corpus Relief

"Habeas review is an extraordinary remedy," *Bousley v. United States*, 523 U.S. 614, 621 (1998), and a petitioner seeking a writ of habeas corpus must comply with the strict requirements of AEDPA, *see* 28 U.S.C. § 2254.  Before the Court reviews the merits of a habeas corpus petition, the Court must determine whether Petitioner complied with the procedural requirements set forth in 28 U.S.C. §§ 2244 and 2254.

### a.  Timeliness

AEDPA imposes upon a petitioner seeking federal habeas relief a one-year statute of limitations.  *See* 28 U.S.C. § 2244(d)(1).  The statute of limitations is tolled if any state post-conviction proceedings are pending after the conviction becomes final.  *See* 28 U.S.C. § 2254(d)(2).  The limitations period is also subject to equitable tolling, which is warranted only when a petitioner has shown "(1) that he [or she] has been pursuing his [or her] rights diligently, and (2) that some extraordinary circumstances . . . prevented timely filing."  *Finley v. Graham*, No. 12-CV-9055, 2016 WL 47333, at *5 (S.D.N.Y. Jan. 4, 2016) (alterations in original) (quoting *Holland v. Florida*, 560 U.S. 631, 649 (2010)).

### b.  Procedural Bar

A federal court "will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that is independent of the federal question and adequate to support the judgment."  *Downs v. Lape*, 657 F.3d 97, 101 (2d Cir. 2011) (quotation marks omitted).  A judgment is "independent" if the "last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar."  *Harris v. Reed*, 489 U.S. 255, 263 (1989) (quotation marks omitted).  A procedural bar is "adequate . . . if it is based on a rule that is firmly established and regularly followed by the state in question."  *Monroe v. Kuhlman*, 433 F.3d 236, 241 (2d Cir. 2006) (quotation marks omitted).  In "exceptional cases," the "exorbitant application of a generally sound [state procedural] rule renders the state ground inadequate to stop consideration of a federal question."  *Lee v. Kemna*, 534 U.S. 362, 376 (2002).

### c.  Exhaustion

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, thereby giving the State the opportunity to pass upon and correct alleged

violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citation

and quotation marks omitted); *see also* 28 U.S.C. § 2254(b)(1)(A) ("An application for a writ of

habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not

be granted unless it appears that . . . the applicant has exhausted the remedies available in the

courts of the State . . . . "). To satisfy this requirement, "the prisoner must fairly present his

claim in each appropriate state court (including a state supreme court with powers of

discretionary review), thereby alerting that court to the federal nature of the claim." *Baldwin*,

541 U.S. at 29 (quotation marks omitted); *see also* 28 U.S.C. § 2254(c) ("An applicant shall not

be deemed to have exhausted the remedies available in the courts of the State, within the

meaning of this section, if he has the right under the law of the State to raise, by any available

procedure, the question presented."). This requirement reflects important "notions of comity

between the federal and State judicial systems." *Strogov v. Att'y Gen. of State of N.Y.*, 191 F.3d

188, 191 (2d Cir. 1999).

There are two components to the exhaustion requirement. *See McCray v. Bennet*, No. 02-

CV-839, 2005 WL 3182051, at *7 (S.D.N.Y. Nov. 22, 2005) ("A two-step analysis is used to

determine whether a claim has been exhausted . . . . "). First, "a petitioner [must] fairly present

federal claims to the state courts in order to give the state the opportunity to pass upon and

correct alleged violations of its prisoners' federal rights." *Carvajal v. Artus*, 633 F.3d 95, 104

(2d Cir. 2011) (alterations and quotation marks omitted); *see also Turner v. Artuz*, 262 F.3d 118,

123 (2d Cir. 2001) (same); *Oliver v. Kirkpatrick*, No. 06-CV-6050, 2012 WL 3113146, at *5

(E.D.N.Y. July 31, 2012) (same). This requirement is satisfied if the claim is presented in a way

that is "likely to alert the [state] court[s] to the claim's federal nature," *Carvajal*, 633 F.3d at 104

(quoting *Lurie v. Wittner*, 228 F.3d 113, 124 (2d Cir. 2000)), and the state courts are

19

"apprise[d] . . . of both the factual and the legal premises of the federal claims ultimately asserted in the habeas petition," *Galdamez v. Keane*, 394 F.3d 68, 73 (2d Cir. 2005); *see also Bermudez v. Conway*, No. 09-CV-1515, 2012 WL 3779211, at *8 (E.D.N.Y. Aug. 30, 2012) (same).  In other words, a state prisoner need not cite "chapter and verse of the Constitution" to satisfy this requirement.  *Carvajal*, 633 F.3d at 104 (quotation marks omitted).  A petitioner may satisfy this requirement by:

> (a) reliance on pertinent federal cases employing constitutional analysis[;]
> (b) reliance on state cases employing constitutional analysis in like fact situations[;]
> (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution[;] and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

*Id.* (quotation marks omitted).  However, it is "not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) (citation omitted).  Rather, the claims must be made in such a way so as to give the state courts a "fair opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim." *Id.* (quotation marks omitted).

"Second, having presented his federal constitutional claim to an appropriate state court, and having been denied relief, the petitioner must have utilized all available mechanisms to secure [state] appellate review of the denial of that claim." *Klein v. Harris*, 667 F.2d 274, 282 (2d Cir. 1981), *overruled on other grounds*, *Daye v. Att'y Gen.*, 696 F.2d 186, 195 (2d Cir. 1982) (en banc); *see also Pettaway v. Brown*, No. 09-CV-3587, 2010 WL 7800939, at *9 (S.D.N.Y. May 3, 2010) (same), *adopted by* 2011 WL 5104623 (S.D.N.Y. Oct. 26, 2011).  In New York, "a criminal defendant must first appeal his or her conviction to the Appellate Division, then must seek further review of that conviction by applying to the Court of Appeals for a certificate granting leave to appeal." *Galdamez*, 394 F.3d at 74.  If the petitioner fails to exhaust his or her

state remedies through the entire appeal process, he or she may still fulfill the exhaustion requirement by collaterally attacking the conviction via available state methods.  *See Klein*, 667 F.2d at 282–83 (noting that, "where the petitioner did not utilize all the appellate procedures of the convicting state to present his claim . . . the petitioner must utilize available state remedies for collateral attack of his conviction in order to satisfy the exhaustion requirement"); *Bernardez v. Bannon*, No. 12-CV-4289, 2016 WL 5660248, at *3 (S.D.N.Y. Sept. 29, 2016).  For example, in New York a defendant may challenge a conviction based on matters not in the record that could not have been raised on direct appeal, *see* N.Y. CRIM. PROC. LAW § 440.10(1)(f), but a defendant may not seek collateral review of claims that could have been raised on direct appeal and were not, *see id.* § 440.10(2)(c); *see also O'Kane v. Kirkpatrick*, No. 09-CV-5167, 2011 WL 3809945, at *7 (S.D.N.Y. Feb. 15, 2011) ("Under New York law, all claims that are record-based must be raised in a direct appeal . . . . It is only when a defendant's claim hinges upon facts outside the trial record, that he may collaterally attack his conviction by bringing a claim under [NY] CPL § 440.10."), *adopted by* 2011 WL 3918158 (S.D.N.Y. Aug. 25, 2011).  In addition, New York permits only one application for direct review.  *See Jiminez v. Walker*, 458 F.3d 130, 149 (2d Cir. 2006) ("[The petitioner] has already taken his one direct appeal [under New York law] . . . . ").  "New York procedural rules bar its state courts from hearing either claims that could have been raised on direct appeal but were not, or claims that were initially raised on appeal but were not presented to the Court of Appeals."  *Sparks v. Burge*, No. 12-CV-8270, 2012 WL 4479250, at *4 (S.D.N.Y. Sept. 18, 2014).

Accordingly, in those situations, a petitioner no longer has any available state court remedy, and the claims are therefore deemed exhausted, but procedurally defaulted.  *See Carvajal*, 633 F.3d at 104 ("If a habeas applicant fails to exhaust state remedies by failing to

adequately present his federal claim to the state courts so that the state courts would deem the claim procedurally barred, we must deem the claim procedurally defaulted." (alteration and quotation marks omitted)); *see also Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001) (noting the reality that deeming an unpresented claim to be exhausted is "cold comfort").  A dismissal of a habeas petition on such grounds is a "disposition . . . on the merits."  *Carvajal*, 633 F.3d at 104 (quotation marks omitted).  "An applicant seeking habeas relief may escape dismissal on the merits of a procedurally defaulted claim only by demonstrating 'cause for the default and prejudice' or by showing that he is 'actually innocent' of the crime for which he was convicted." *Id.* (quoting *Aparicio*, 269 F.3d at 90); *see also Dretke v. Haley*, 541 U.S. 386, 388 (2004) (holding that "a federal court will not entertain a procedurally defaulted constitutional claim in a petition for habeas corpus absent a showing of a cause and prejudice to excuse the default," or showing that the petitioner "is actually innocent of the underlying offense").

  B.  Application

  Petitioner makes six arguments in support of his Petition, across the original Petition and Petitioner's Supplemental Brief: (1) the evidence was insufficient to support the verdict, (*see* Pet. ¶ 12); (2) the verdict was against the weight of the evidence, (*id.*); (3) Petitioner's trial counsel was ineffective for (a) failure to meet with and prepare witnesses, (b) failure to investigate and prepare for trial, (c) failure to object to object to the introduction of letters provided to prosecutors by Avila and obtained via the cell search on multiple grounds, including that Petitioner was allegedly denied his Confrontation Clause rights and the search itself was illegal, (d) failure to object to Green's presentment for identification at trial wearing an orange prison jumpsuit, (e) failure to object to "prosecutorial misconduct during summation," (f) failure to pay biennial dues, and (g) failure to preserve claims for appellate review, (Pet'r's Suppl. Br. 5–6,

unnumbered 40–41; Pet. ¶ 12); (4) Petitioner's appellate counsel was ineffective for "failure to

raise a Confrontation Clause violation and an ineffective assistance of [trial] counsel claim for

failure to preserve," (Pet'r's Suppl. Br. 6; Pet. ¶ 12); (5) prosecutorial misconduct based on the

prosecution's alleged fraud on the County Court by presenting evidence of Petitioner's $10,000

withdrawal in December 2006 when "said transaction was factually a business transaction,"

(Pet'r's Suppl. Br. 11–12); and (6) actual innocence, (*id.* at 14–15).[7]  Judge Davison dismissed

all six claims.  (*See* R&R 23–53.)[8]

---

[7] Petitioner attached a number of documents to his Supplemental Brief, which are neither labeled as exhibits nor paginated.  When citing to the brief itself, the Court refers to the brief's native pagination.  When citing to the documents attached to the brief, the Court refers to the ECF-stamped page numbers at the top-right corner of each page in the format of "unnumbered [page]."

[8] Judge Davison noted that "[i]n his August 15, 2019 Reply, Petitioner set forth, for the first time, a laundry list of additional contentions, including that the indictment was jurisdictionally defective, the trial court lacked subject matter jurisdiction over his case, there were deficiencies in service, and a vague reference to Rule 11 sanctions."  (R&R 24 n.4.)  Judge Davison recommended that this Court "decline to consider these arguments," since they were improperly raised for the first time on reply.  (*Id.*)  Petitioner objects to this recommendation, arguing that "some of the arguments were included in pre-trial motions and post-conviction motions as well as reconsideration motions, and replies" and urges that "all previous state court submissions furnished by the Petitioner should be part of this record in order for this Court to render a decision based on a full review that includes all circumstances!"  (Obj's 25.)  Petitioner's objections are inapposite.  Judge Davison's recommendation is based on Petitioner's briefing before *this* Court; any arguments that Petitioner may or may not have made in submissions to state courts are irrelevant.

Longstanding Second Circuit precedent instructs courts "'not [to] consider an argument raised for the first time in a reply brief,'" *United States v. Pocinoc*, 833 F. App'x 847, 849 (2d Cir. 2020) (summary order) (quoting *United States v. Yousef*, 327 F.3d 56, 115 (2d Cir. 2003)), and "this rule is consistently applied in the habeas context," *Williams v. Chappius*, No. 16-CV-829, 2018 WL 7133267, at *10 (S.D.N.Y. Nov. 16, 2018) (citation omitted), *report and recommendation adopted*, 2019 WL 330630 (S.D.N.Y. Jan. 25, 2019), *appeal dismissed*, No. 19-484 (2d Cir. Apr. 29, 2019); *see also Melo v. United States*, 825 F. Supp. 2d 458, 464 (S.D.N.Y. 2011) (noting, in habeas context, that the petitioner waived ineffective assistance of counsel argument "because he raised it for the first time in his [r]eply").  Petitioner cites no authority nor raises any unique circumstance to justify a departure from this precedent; indeed, given the substantial procedural leeway afforded to Petitioner in this Action, Petitioner is a particularly poor candidate for such a departure.  As such, this Court will accept Judge Davison's recommendation and decline to consider these arguments.

Petitioner has filed extensive objections, raising his disagreements on a page-by-page—and, at times, a sentence-by-sentence—basis. Petitioner also appears to raise new claims in the Objections, which were neither raised in the Petition nor Petitioner's Supplemental Brief. (*See, e.g.*, Obj's 3 (arguing that any statements flowing from Green's allegedly warrantless arrest should have been suppressed); *id.* at 4 (arguing that the trial court erred in admitting evidence of items found by police executing search warrant of Petitioner's home); *id.* at 28–29 (arguing that an alleged "scheme" by the prosecution "violated [Petitioner's] procedural due process of law").)

This Court will not consider any claims raised by Petitioner in his Objections which were not raised in the Petition. *See Read v. Superintendent Mr. Thompson*, No. 13-CV-6962, 2016 WL 165716, at *11 (S.D.N.Y. Jan. 13, 2016) (explaining that "[the] [p]etitioner's failure to raise [a claim] in his [] [p]etition . . . precludes [its] consideration"); *see also Davis v. Herbert*, No. 00-CV-6691, 2008 WL 495316, at *1 (S.D.N.Y. Feb. 25, 2008) ("[U]pon review of a habeas petitioner's objections to a magistrate judge's report and recommendation, the [c]ourt may not consider claims raised for the first time in the petitioner's objections."); *McPherson v. Johnson*, No. 95-CV-9449, 1996 WL 706899, at *2 (S.D.N.Y. Dec. 9, 1996) ("[The] [p]etitioner cannot raise, in his objection to the [m]agistrate [j]udge's [r]eport, new claims not raised in his initial petition."). Given the somewhat disjointed structure of the Objections, the Court will follow the structure of the R&R to address Petitioner's proper objections.

### 1.  Exhaustion and Timeliness

Judge Davison found that Petitioner's claims of prosecutorial misconduct and actual innocence were both untimely (since "[t]he first time Petitioner asserted either claim during the habeas process was in his January 14, 2018 supplemental brief," over four years after AEDPA's one-year limitations period ended, (R&R 26)) and unexhausted (since "Petitioner never raised

either argument in any state post-conviction proceeding," (*id.*)), and thus, procedurally barred. However, noting that "a district court may still consider unexhausted arguments that are 'plainly meritless,'" (*id.* at 28 (quoting *Rhines*, 544 U.S. at 277)), Judge Davison determined that even if Petitioner's claims of prosecutorial misconduct and actual innocence were not procedurally barred, they were meritless. (*Id.*)  Petitioner objects to this conclusion, arguing both that he "should not be penalized for the missteps and ineffectiveness of appellate counsel," presumably in failing to exhaust these claims, and that "[t]he contention that Petitioner never raised either argument of prosecutorial misconduct and actual innocence 'in any state post-conviction proceeding' is <u>inaccurate</u>." (Obj's 26–27.)[9]

Petitioner is correct that Judge Davison erred in concluding that "Petitioner never raised either argument in any state post-conviction proceeding." (R&R 26.)  To the contrary, Petitioner raised both claims in various forms, though only Petitioner's claim of actual innocence is properly exhausted.  As Petitioner noted in the Objections, Petitioner argued in his First 440.10 Motion that he was "actually and factually innocent of" the charges against him.  (Resp't's Opp'n Ex. 40, at 5, 7–8.)  The County Court denied this claim, explaining that Petitioner failed to provide any evidence, "let alone clear and convincing evidence," to establish his actual innocence, (Resp't's Opp'n Ex. 44, at 2), and Petitioner unsuccessfully sought to appeal the County Court's ruling, sought reconsideration of the County Court's ruling, and sought to appeal the denial of his unsuccessful motion for reconsideration, (*see* Resp't's Opp'n Exs. 48, 56, 59, 60); *see Bowie*, 25 N.Y.3d at 1069; *see also Bowie*, 28 N.Y.3d at 1071; *Bowie*, 27 N.Y.3d at

---

[9] The Court notes that the Objections are written with atypical punctuation, including frequent underlining and parentheses.  Any alterations to quotations from the Objections by the Court are indicated by brackets; all other punctuation appearing in quotations from the Objections is native.

1128.  Thus, Petitioner's claim of actual innocence is exhausted.  *See Klein*, 667 F.2d at 282

(explaining that to satisfy AEDPA's exhaustion requirement, a petitioner "must have fairly

presented to an appropriate state court the same federal constitutional claim that he now urges

upon the federal courts," and "utilized all available mechanisms to secure appellate review of the

denial of that claim").

However, Petitioner's claim of prosecutorial misconduct is unexhausted.  While

Petitioner did argue that "the prosecution deliberately mislead [sic] the jury into believing that

certain money transactions [sic] were utilized to pay for the commission of a crime when these

funds were exclusively used to conduct legal business transactions" in his First 440.10 Motion,

(*see* Resp't's Opp'n Ex. 40, at 8), the County Court found that this claim was ineligible for NY

CPL § 440.10 relief, because it was a "matter[] of record and therefore could have

been . . . raised on [direct] appeal," (Resp't's Opp'n Ex. 44).  But because Petitioner is entitled to

only one direct appeal under New York state law, *see* N.Y. CT. APP. R. § 550.20, he no longer

has any further remedies available before the state courts, and his claim here is therefore deemed

exhausted, but procedurally defaulted, *see Carvajal*, 633 F.3d at 104 ("If a habeas applicant fails

to exhaust state remedies by failing to adequately present his federal claim to the state courts so

that state courts would deem the claim procedurally barred, we must deem the claim

procedurally defaulted." (alteration and quotation marks omitted)).[10]

---

[10] Petitioner includes in the Objections an argument concerning "The Brady Violation" that "[i]n a separate proceeding Index No. 4143-2015 Petitioner filed an Article 78 Motion that the District Attorney of Orange County nor anyone in that office wants to discuss or uncover," apparently seeking the production of certain documents concerning Avila's criminal case.  (Obj's 27–28.)  The Court fails to see the relevance of any such proceeding to Petitioner's claims.  First, the existence of this proceeding has no impact on whether Petitioner's claim of prosecutorial misconduct is exhausted; as explained, Petitioner needed to raise this claim in a direct appeal. Second, as Judge Davison explained elsewhere in the R&R and as this Court will explain infra,

Ultimately, however, Judge Davison's determination as to exhaustion is of little import to the disposition of these claims, because Judge Davison is correct that Petitioner's claims of actual innocence and prosecutorial misconduct are untimely, and, in any event, meritless. As explained above, AEDPA imposes upon a petitioner seeking federal habeas relief a strict one-year statute of limitations. *See* 28 U.S.C. § 2244(d)(1). The statute of limitations is statutorily tolled if any state post-conviction proceedings are pending after the conviction becomes final, and subject to equitable tolling when a petitioner has shown that "(1) that he [or she] has been pursuing his [or her] rights diligently, and (2) that some extraordinary circumstances . . . prevented timely filing." *Finley*, 2016 WL 47333, at *5 (alterations in original) (quotation marks omitted).

As Judge Davison explained, Petitioner's conviction became final on October 14, 2012, following the expiration of the 90-day period in which Petitioner was eligible to file a writ of certiorari with the United States Supreme Court following the Court of Appeals' denial of his motion for leave to appeal. (*See* R&R 24.) Thus, AEDPA's one year limitations period ended on October 14, 2013. (*See id.*) While Petitioner filed the original Petition within that limitations period, Petitioner did not raise either his claim of actual innocence or prosecutorial misconduct until January 14, 2018, when he filed Petitioner's Supplemental Brief. (*Compare* Pet. *with* Pet'r's Suppl. Br.) And, as Judge Davison explained, "[t]he Supreme Court has held that a habeas petitioner cannot assert new claims that were absent from the original petition after the expiry of the limitations period, even where the original petition was timely." (R&R 26–27

---

Avila's alleged violation of a separate court order in a completely unrelated case and Avila's credibility (or lack thereof) are wholly irrelevant to Petitioner's claims. Thus, there are no documents that Petitioner could attain via this separate Article 78 proceeding that could affect Petitioner's claims here.

(italics omitted) (citing *Mayle v. Felix*, 545 U.S. 644, 656–57 (2005)).)  Petitioner makes no

attempt to argue that these claims should have been subject to tolling, rather, Petitioner's only

objection to Judge Davison's determination that these claims are untimely appears to be the

conclusory assertion that "Petitioner had been [sic] timely throughout this entire process without

default, and has diligently pursued his rights."  (Obj's 25.)  Thus, Petitioner's claims of actual

innocence and prosecutorial misconduct are untimely, and barred from habeas review.[11]

Finally, even if Petitioner's claims of actual innocence and prosecutorial misconduct

were not procedurally barred as unexhausted or untimely, this Court agrees with Judge Davison

that both claims fail on the merits, for the reasons explained below.  *See Rhines*, 544 U.S. at 277

(courts may deny unexhausted habeas claims that are "plainly meritless"); *see also* 28 U.S.C.

§ 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits,

notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the

State.").

### 2.  Actual Innocence

As Judge Davison explained in the R&R, "the Supreme Court has held that 'actual

innocence is not itself a constitutional claim but instead a gateway through which a habeas

---

[11] Judge Davison went on to explain that there is an exception to this rule via Fed. R. Civ. P. 15(c)(2)'s relation-back provision, where "new claims may be deemed to relate back to the original petition if they arise from the same conduct, transaction, or occurrence."  (R&R 27.)  However, because "[t]he Supreme Court [has] ruled that each theory under which a habeas petition could be granted is to be considered as a discrete transaction and occurrence, and simply relating to the same trial, conviction, or sentence is insufficient to relate back to the original pleadings," (*id.* (italics omitted) (citing *Mayle*, 545 U.S. at 662)), Judge Davison found that "Petitioner's claims of prosecutorial misconduct and actual innocence are 'new' and do not relate back to his original Petition," (*id.*).  Even construing the Objections liberally, *Triestman*, 470 F.3d at 474, Petitioner lodges no specific objection to this determination from Judge Davison, and this Court, upon review of the R&R, finds that "the factual and legal bases supporting" Judge Davison's ruling on this claim "are not clearly erroneous or contrary to law," *Eisenberg*, 564 F. Supp. 2d at 226.

petitioner must pass to have his otherwise barred constitutional claim considered on the merits.'"
(R&R 29.)[12]   As such, "a petitioner seeking access to a federal habeas court in the face of a
procedural obstacle must advance *both* a legitimate constitutional claim *and* a credible and
compelling claim of actual innocence."   *Rivas v. Fischer*, 687 F.3d 514, 540 (2d Cir. 2012).   A
claim of actual innocence is thus analyzed in the same manner as a claim made under the
"fundamental miscarriage of justice" standard: "the evidence must establish sufficient doubt
about [the petitioner's] guilt to justify the conclusion that his [continued punishment] would be a
miscarriage of justice *unless* his conviction was the product of a fair trial."   *Id.* at 541 (quoting
*Schlup*, 513 U.S. at 316).   The Second Circuit has explained that to satisfy this standard, a claim
of actual innocence must be both "credible" and "compelling."   *Id.* (citing *House v. Bell*, 547
U.S. 518, 521, 538 (2006)).   "For the claim to be 'credible,' it must be supported by 'new
reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness
accounts, or critical physical evidence—that was not presented at trial.'"   *Id.* (quoting *Schlup*,

---

[12] Petitioner appears to have attempted to raise both a "gateway" claim of actual innocence—which the Supreme Court has explained is "procedural, rather than substantive," *Schlup v. Delo*, 513 U.S. 298, 314 (1995)—and a "free-standing" claim of actual innocence based on the Eighth Amendment.   (*See* Pet'r's Suppl. Br. 14 ("Petitioner has made the requisite showing required to obtain relief on the merits of an Eight[h] and Fourteenth Amendment claim of <u>Actual Innocence</u>.   'The United States Supreme Court has recognized that a credible showing of actual innocence may allow a prisoner to pursue . . . constitutional claims . . . on the merits notwithstanding the existence of a procedural bar to relief' – that is, actual innocence is a gateway to review of another claim which is otherwise procedurally barred." (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013))).)   While the Supreme Court has hinted at the possibility that a habeas petitioner could be entitled to relief based *solely* on his or her actual innocence, this claim appears to be limited to the capital context, if it exists at all.   *Schlup*, 513 U.S. at 316 (explaining that in capital case, "the evidence of innocence would have had to be strong enough to make his execution constitutionally intolerable *even if* his conviction was the product of a fair trial" (quotation marks omitted)).   Moreover, as described *infra*, Petitioner has not even made a "gateway" showing of actual innocence, so even assuming arguendo that he could state a "free-standing" claim of actual innocence in a non-capital case, such a claim would fail.

513 U.S. at 324).  "For the claim to be 'compelling,' the petitioner must demonstrate that 'more

likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a

reasonable doubt—or to remove the double negative, that more likely than not any reasonable

juror would have reasonable doubt.'"  *Id.* (quoting *House*, 547 U.S. at 538); *accord Olivares v.

Ercole*, 975 F. Supp. 2d 345, 351–54 (S.D.N.Y. 2013) (same); *see also Dunham v. Travis*, 313

F.3d 724, 730 (2d Cir. 2002) (finding that habeas petitioner could not demonstrate "actual

innocence" where the petitioner "presented no new evidence of innocence and did not make the

necessary showing under *Schlup*").  As Judge Davison noted, this is an incredibly high bar.

(R&R 29 ("Put another way, Petitioner must present an 'extraordinarily high and truly persuasive

demonstration of actual innocence.'" (quoting *Ortiz v. Barkley*, 558 F. Supp. 2d 444, 458

(S.D.N.Y. 2008))).)

The Court agrees with Judge Davison that Petitioner does not meet this high threshold, as

the evidence he has presented for his innocence is neither credible nor compelling.  At the outset,

the Court emphasizes that a claim of actual innocence can only succeed in overcoming a

procedural bar if it is, inter alia, "supported by '*new* reliable evidence.'"  *Rivas*, 687 F.3d at 540

(emphasis added) (quoting *Schlup*, 513 U.S. at 324).  However, "[o]nce it has been determined

that the new evidence is reliable, *Schlup* unequivocally requires that reviewing courts consider a

petitioner's claim in light of the evidence in the record as a whole."  *Doe v. Menefee*, 391 F.3d

147, 162 (2d Cir. 2004).  Thus, Judge Davison's recounting of the record is critical to determine

"whether [the] new evidence truly throws the petitioner's conviction into doubt, or whether it is

so overwhelmed by the weight of other evidence that it is insufficient to raise a question as to a

petitioner's factual innocence," but Petitioner's actual innocence claim cannot rise or fall only on

the existing evidence.  *Id.*

a.  Existing Evidence

The Court agrees with Judge Davison that the evidence against Petitioner at trial was "overwhelming," as it included: evidence that Petitioner relentlessly contacted Nunez and her family following their breakup in an attempt to convince Nunez to resume their relationship; cell tower data demonstrating that Petitioner and Green were together just hours before the murder; phone records demonstrating that Petitioner and Green spoke to each other just minutes before the murder and immediately after; eyewitness testimony confirming that the gun used to kill Nunez belonged to Petitioner; and dozens of jailhouse letters between Petitioner and Green in which the two effectively admit to their conspiracy.  (R&R 29–31.)  Moreover, Green's written confession to police—which was not admitted at Petitioner's trial, but can be considered in assessing a claim of actual innocence, *see Doe*, 391 F.3d at 162 (explaining that because "the issue before [a court considering a claim of actual innocence] is not legal innocence but factual innocence," "reviewing courts [must] consider *all* evidence without regard to its admissibility")—is, as Judge Davison aptly put it, "extremely damaging," (R&R 31).  In it, Green admitted, inter alia, that "[Petitioner] came to [Green] and asked [Green] if [Green] knew anyone who would kill his ex-girlfriend" and told Green "he would pay the person to do it"; that when an effort to hire a third party to commit the murder failed, Petitioner "told [Green] that he paid [Green] and he expected to get done what he paid [Green] to get done"; that "[Petitioner] wanted [Green] to kill his ex-girlfriend in the daytime" and "make it look like a robbery so that [Petitioner] would not be implicated"; and that "[Petitioner] gave [Green] a handgun" that Green later used to murder Nunez.  (*See* Resp't's Opp'n Ex. 75, Ex. 6.)

While Petitioner lodges numerous objections to this recitation of the existing evidence, none of Petitioner's arguments is convincing.  First, many of Petitioner's arguments are either facially illogical or irrelevant.  For instance, Petitioner appears to argue that the evidence does

not demonstrate that Petitioner was obsessed with Nunez following their breakup, because "there were never any police reports or Orders of Protection presented at trial against Petitioner" and "Petitioner was the cheater, and was involved with more than one woman at the same time, therefore it don't [sic] make sense to say that Petitioner was obsessed with [Nunez]."  (Obj's 29.)  Common sense dictates that a jilted ex-partner can become obsessed with his or her former companion even if he or she has other romantic attachments, and such an obsession is not only signified by the existence of a protective order; it can also be signified by, for instance, the jilted ex-partner calling his or her former companion over 1,000 times in a period of a few months, as Petitioner did.  As another example, Petitioner argues that that "[n]ever ever, was any payment to Green or anyone ever proven at trial" and "no one claimed that Petitioner was present during the robbery in spite of the Prosecutor insinuating otherwise."  (*Id.* at 28.)  But the prosecution's theory was that Petitioner never paid Green, which is supported by a jailhouse letter from Green to Petitioner in which Green complains that Petitioner never paid him.  (*See* Resp't's Opp'n Ex. 10, at 133 ("I still never even got the other ten jelly beans from the party.").)  And, it is undisputed that Petitioner was not present at the robbery; the prosecution's theory, on which Petitioner was convicted, was murder for hire.

Further, the actual innocence inquiry is not a means to attack the sufficiency or the weight of the evidence on which Petitioner was convicted.[13]  Rather, as explained above, an evaluation of the record as a whole is only relevant insofar as the new evidence presented throws Petitioner's conviction into doubt such that no reasonable juror, in considering all of the evidence presented (i.e., both the existing record and the new evidence), would find Petitioner

---

[13] Petitioner has separately raised both sufficiency of the evidence and weight of the evidence challenges, which this Court will address infra.

guilty.  *See Doe*, 391 F.3d at 162–63.  As such, Petitioner's rehashing of the evidence presented

to the state jury without the framing of how the new evidence might affect that evidence is not

relevant to his claim of actual innocence.  *See Brown v. Cunningham*, No. 14-CV-3515, 2015

WL 2405559, at *13 (S.D.N.Y. Apr. 22, 2015) ("A showing of actual innocence requires more

than merely arguing that the jury's finding of guilt is against the weight of the evidence."

(citation omitted)), *report and recommendation adopted*, 2015 WL 3536615 (S.D.N.Y. 2015);

*see also Eduoardo v. Smith*, No. 10-CV-622, 2010 WL 5584599, at *5 (S.D.N.Y. Jan. 11, 2010)

("It cannot be said that, in light of the new evidence, no reasonable juror would have voted to

find [the] [p]etitioner guilty [since] [t]he [new evidence] do[es] not contradict evidence presented

by the [prosecution] at trial."); *Brown v. Jones*, No. 18-CV-359, 2019 WL 2569649, at *5

(N.D.N.Y. June 21, 2019) ("[The] [p]etitioner offers no new evidence of his innocence.  Instead,

he seeks to rehash what was already decided by again calling into question the strength of the

evidence previously considered by the jury.  Accordingly, he has failed to plead, let alone

demonstrate, actual innocence.").

### b.  New Evidence

The Court further agrees with Judge Davison that "Petitioner's new evidence is

unavailing," (R&R 33), and wholly insufficient to "throw[] . . . [P]etitioner's conviction into

doubt," *Doe*, 391 F.3d at 162.

First, Petitioner introduced a December 7, 2006 cashier's check for $10,000 made out to

Karen Bryant, with the memo reading "Re: Patrick Bowie 57 Prospect Avnue [sic]," and an

accompanying letter dated September 3, 2010 from Patricia Ulvila at the Orange County Trust

Company (who appears to have signed the cashier's check) which states: "On December 7, 2006,

an Official Bank check . . . was issued to [Petitioner].  The check was payable to Karen Bryant in

the amount of $10,000.00.  The check cleared on 12/12/2006."  (Pet'r's Suppl. Br. at

unnumbered 17–19.)  Petitioner claimed in the Petition that this proves that the prosecution's

theory of murder for hire was false, since "said transaction was factually a business transaction

that the [P]etitioner made to buy a property."  (*Id.* at 11.)  Judge Davison concluded that

"Petitioner's argument is misplaced," because the crime of which Petitioner was convicted

requires only a showing that Petitioner and Green had an agreement, which was amply supported

by evidence separate and apart from Petitioner's $10,000 withdrawal in December 2006.  (R&R

33.)  Moreover, as noted above, the prosecution's theory at trial was actually that Petitioner

never paid Green; Petitioner's bank records were submitted as a handwriting sample, but also to

demonstrate that Petitioner had the financial wherewithal to orchestrate the conspiracy.  (*Id.* at

33–34.)  In the Objections, Petitioner largely repeats the argument made in the Petition: that

"[t]he Prosecutor's purpose of using Petitioner's bank records to prove 'handwriting' is a smoke

screen," "[t]here's no doubt that the Jury believed there was an agreement between Petitioner

and Green because of the bank records," and "if the Jury had viewed the actual check, the Jury

would have seen that the check was used for legitimate business and had nothing to do with

Green, which would have certainly contradicted the Prosecutor's theory."  (Obj's 31–33.)  This

Court agrees with Judge Davison.  This evidence does not even undercut the prosecution's

theory at trial, and certainly is not "compelling" according to the standard set out in *Schlup*.

Second, Petitioner introduced two sworn affidavits from Green stating that both he and

Petitioner were innocent.  (Pet'r's Suppl. Br. at unnumbered 20, 42–43.)  Judge Davison

concluded that this evidence carries no weight, noting that Green changed his story multiple

times before being convicted at his own trial and that there are numerous jailhouse letters from

Petitioner to Green in which Petitioner urged Green to claim that his confession to police was

coerced and to sign a new affidavit.  (*See* R&R 34; *see also, e.g.*, Resp't's Opp'n Ex. 10, at 115

("A) Did [Petitioner] ever give you burner – NO[;] B) Did [Petitioner] ever tell you harm anyone[;] C) Did [Petitioner] ever give you $ - NO[;] D) calls was about house hunting & help[;] E) last call was Happy New Year[.] *Need sorry notarized statement today*").)  Petitioner argues in the Objections that "[t]he affidavit isn't self serving and carries credibility in this case because his affidavit coupled with the fact that he refused to testify falsely at trial for the Prosecutor reflects a person maintaining their innocence," and "[t]here's other affidavits [sic] that Petitioner now has in his possession, which is part of the reason the District Attorney continues avoiding any hearing!"  (Obj's 33.)  First, this Court cannot consider "other affidavits" that have not been presented here, and Petitioner's opportunity to present new evidence to this Court has long passed.  *See Read*, 2016 WL 165716, at *11 (explaining that "[the] [p]etitioner's failure to raise [a claim] in his [] [p]etition . . . precludes [its] consideration").  Moreover, the question is whether affidavits written by Green declaring his and Petitioner's innocence and disavowing Green's signed confession constitute "compelling" evidence sufficient to throw Petitioner's conviction into doubt such that a reasonable juror could not find Petitioner guilty. The Court agrees with Judge Davison that this evidence simply does not meet this high bar, especially because this hypothetical reasonable juror would be considering these affidavits alongside evidence that these affidavits were written at Petitioner's behest.

Finally, Petitioner introduced forensic evidence demonstrating that there was insufficient evidence to determine whether Petitioner's DNA was on the gun and that there were no fingerprints on the gun or bullets.  (*See* Pet'r's Suppl. Br. at unnumbered 22–24.)  Judge Davison concluded that this is irrelevant, because there is no dispute that it was Green who fired the weapon, not Petitioner, and there was substantial evidence separate and apart from this forensic evidence which linked Petitioner to the murder weapon.  (R&R 34.)  Petitioner fails to engage

with this conclusion in his Objections, instead extraneously arguing that "if the results of the

forensic evidence were in the Prosecutor's favor, Petitioner is certain that: The Prosecutor would

have used the forensic evidence to have built [sic] a real case and the (R&R) would be singing a

different tune," and that "there's no doubt that if there were 'prints' on the weapon or the bullets,

the Prosecutor would have had a party."  (Obj's 33–34.)  In any event, the Court agrees with

Judge Davison that this forensic evidence is far from "compelling" evidence sufficient for

Petitioner to succeed on his claim of actual innocence.

Judge Davison's recommendation on this claim is adopted.

### 3.  Sufficiency of the Evidence

Judge Davison concluded that Petitioner's claim that the verdict was based on insufficient

evidence is procedurally barred from habeas review, or, in the alternative, meritless.  (R&R 35.)

Petitioner does not appear to contest this conclusion, instead arguing that this "is just more

reasons [sic] for this Court to carefully review Petitioner's claim of ineffective assistance of

counsel which is crucial & warranted."  (Obj's 34.)

 The Court agrees with Judge Davison that Petitioner's sufficiency of the evidence claim

is procedurally barred from habeas review.  As explained above, a federal court "will not review

questions of federal law presented in a habeas petition when the state court's decision rests upon

a state-law ground that is independent of the federal question and adequate to support the

judgment."  *Downs*, 657 F.3d at 101 (quotation marks omitted).  Here, the Second Department

explicitly stated that Petitioner's sufficiency of the evidence claim was "unpreserved for

appellate review," *Bowie*, 919 N.Y.S.2d at 894, thus, the Second Department's decision on

Petitioner's sufficiency of the evidence claim was based on an independent and adequate state

law ground: Petitioner's failure to preserve his sufficiency of the evidence claim for appellate

review, as required by NY CPL § 470.05, *see People v. Hawkins*, 11 N.Y.3d 484, 492 (2008)

("To preserve for this [c]ourt's review a challenge to the legal sufficiency of a conviction, a

defendant must move for a trial order of dismissal, and the argument must be specifically

directed at the error being urged.  As we have repeatedly made clear—and underscore again—

general motions simply do not create questions of law for this [c]ourt's review." (quotation

marks and citations omitted) (collecting cases)).  While the Second Department did also find that

"[i]n any event," the evidence presented at trial "was legally sufficient to establish the

[Petitioner's] guilt beyond a reasonable doubt," *Bowie*, 919 N.Y.S.2d at 894, the Second Circuit

has made clear that "where a state court says that a claim is 'not preserved for appellate review'

and then rule[s] 'in any event' on the merits, such a claim is not preserved," *Fama v. Comm'r of

Corr. Servs.*, 235 F.3d 804, 810 n.4 (2d Cir. 2000) (quoting *Glenn v. Bartlett*, 98 F.3d 721, 724–

25 (2d Cir. 1996)); *accord Grant v. Bradt*, No. 10-CV-394, 2012 WL 3764548, at *3 (S.D.N.Y.

Aug. 30, 2012) (same).

      The only way that Petitioner can overcome this procedural bar is if he can demonstrate

"'cause for the default and prejudice'" or that he is "'actually innocent' of the crime for which he

was convicted," *Carvajal*, 633 F.3d at 104 (quoting *Aparicio*, 269 F.3d at 90).  Petitioner cannot

establish "cause" and "prejudice."  A habeas petitioner can establish "cause" if he or she can

demonstrate that "some objective factor, external to [t]he [p]etitioner's defense, interfered with

his [or her] ability to comply with a state procedural rule," *Gutierrez v. Smith*, 702 F.3d 103,

111–12 (2d Cir. 2012), but as Judge Davison observed, (R&R 36), Petitioner has offered no

explanation for his failure to preserve his sufficiency of the evidence claim at trial based on this

standard.  Given that Petitioner cannot demonstrate "cause," it is unnecessary for the Court to

determine whether he has demonstrated "prejudice," but as explained below, because Petitioner's

sufficiency of the evidence claim is meritless, there was no error at trial at all, let alone one

which "resulted in 'substantial disadvantage, infecting [the] entire trial with error of

constitutional dimensions,'" as required to establish prejudice. *Gutierrez*, 702 F.3d at 112

(alteration in original) (quoting *Murray v. Carrier*, 477 U.S. 478, 494 (1986)). And, as explained

above, Petitioner cannot demonstrate that he is actually innocent. *See supra* II.B.2.

       The Court further agrees with Judge Davison that even if Petitioner's sufficiency of the

evidence claim were not procedurally barred, this claim is meritless. First, as Judge Davison

explained, a habeas court examining a sufficiency of the evidence claim must resolve all factual

disputes in favor of the prosecution. (*See* R&R 36.) *See also Cavazos v. Smith*, 565 U.S. 1, 7

(2011) ("[*Jackson v. Virginia*, 443 U.S. 307 (1979)] unambiguously instructs that a reviewing

court 'faced with a record of historical facts that supports conflicting inferences must presume—

even if it does not affirmatively appear in the record—that the trier of fact resolved any such

conflicts in favor of the prosecution, and must defer to that resolution.'" (quoting *Jackson*, 443

U.S. at 319)); *accord Hamilton v. Superintendent, E. N.Y. Corr. Facility*, No. 11-CV-1332, 2015

WL 13306815, at *15 (S.D.N.Y. Sept. 10, 2015) ("In evaluating a legal-insufficiency claim, a

court does not 'ask itself whether *it* believes that the evidence at trial established guilt beyond a

reasonable doubt.' Rather, 'the relevant question is whether, after reviewing the evidence in the

light most favorable to the prosecution, *any* rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt.'" (quoting *Jackson*, 443 U.S. at 318–19)),

*report and recommendation adopted*, 2017 WL 19441144 (S.D.N.Y. May 9, 2017), *appeal

dismissed*, 2017 WL 6878094 (2d Cir. Dec. 12, 2017). Consistent with this directive, Judge

Davison found that "the prosecution submitted ample evidence to satisfy the charges [brought

against Petitioner] and to support each element of the [crimes]," rejecting the counterarguments

made by Petitioner concerning the use of circumstantial evidence and the admissibility of the letters recovered from the cell search.  (R&R 37–39.)

In the Objections, Petitioner reasserts his claims that his conviction was based on insufficient evidence because it was based exclusively on circumstantial evidence and because the jailhouse letters should not have been admitted into evidence because they were allegedly obtained in violation of the cell search warrant and Avila's separate court-ordered injunction. (*See* Obj's 35–39.)  None of the arguments raised in the Objections is availing.  The crux of Petitioner's argument regarding circumstantial evidence appears to be that the evidence presented against Petitioner at trial was "so scant that the Jury could only speculate or conjecture [sic] as to [Petitioner's] guilt or innocence."  (*Id.* at 35.)  But, as outlined by the Court above in evaluating Petitioner's claim of actual innocence, the evidence presented against Petitioner was far from "scant," and in fact, was overwhelming.  Petitioner goes on to take issue with the way in which the jury weighed certain evidence presented at trial, (*see id.* at 35–36 ("Petitioner's <u>actions</u> and visits with the family was normal routine [sic], there were no threatening <u>statements</u> ever to the victim or her family, this can be verified by this Court reviewing the trial records.")), and with the credibility of certain witnesses who testified at trial, (*see id.* at 36–37 ("[W]hat's not true is the false testimony given by the victim's brother at trial, however, the witness, (the only witness) that gave testimony at trial concerning threats was . . . Picon who lied and 'at the time' did not speak or understand English.  Again, ironically, no one else in the crowd heard any threats or arguments except . . . Picon, that's what's reasonable not to believe [sic].")).  But such vague, self-serving, and unsupported disagreements cannot form the basis of a sufficiency of the evidence claim, and in any event, as Judge Davison explained elsewhere in the R&R and as this Court explains below, "a habeas court must defer to the assessments of the weight of the

evidence and credibility of the witnesses that were made by the jury." *Garrett v. Perlman*, 438 F. Supp. 2d 467, 470 (S.D.N.Y. 2006) (citation omitted); *see also Cavazos*, 565 U.S. at 8 (dismissing sufficiency of the evidence claim, explaining, "it is not the job of [a habeas court] . . . to decide whether the [prosecution's] theory was correct"; "the jury decided that question, and its decision is supported by the record").

As for the jailhouse letters, Petitioner argues that "[t]he (R&R) has a twist compared to Petitioner's argument, Petitioner's main point was not the 'admissibility' of the (legal mail) (letter to attorney) & (the notes) but the complete violation of the cell search warrant itself." (Obj's 37.)  This Court sees no distinction between these two arguments.  The remedy for an unlawful search is the exclusion of the evidence obtained as a result of that search at trial.  *See, e.g.*, *Mapp v. Ohio*, 367 U.S. 643 (1961).  Nonetheless, as explained below, the cell search was lawful and the letters were properly admitted at trial.  Petitioner also reasserts his argument that the letters should not have been admitted at trial because the prosecution was only able to obtain the letters due to Avila's intervention, and in contacting the prosecutor's office, Avila allegedly violated a court-ordered injunction in another action.  (*See* Obj's 37–39.)  However, Petitioner fails to demonstrate why this is relevant; rather, this Court agrees with Judge Davison that "Avila's compliance, or alleged lack thereof, of a separate court order in a completely unrelated case has nothing to do with Petitioner's case and the admissibility of evidence."  (R&R 39.)

In sum, the Court finds that Petitioner's sufficiency of the evidence claim is procedurally barred, and, in any event, without merit.  Judge Davison's recommendation on this point is adopted.

### 4.  Weight of the Evidence

Judge Davison recommended that Petitioner's weight of the evidence claim be denied, because "[a] claim attacking the weight of the evidence is based on state law and is not reviewable in a federal habeas proceeding."  (R&R 40.)  Petitioner does not appear to lodge a specific objection to this portion of the R&R, but Petitioner spends a substantial portion of the Objections arguing that the jury weighed the evidence improperly.  For example, Petitioner argues that there was no evidence that he and Nunez had gotten into an argument on the day of her murder, because the only witness who testified about the argument was Picon, who "did not speak or understand much English at all," as evidenced by the fact that "the Prosecutor introduced an interpreter in court in order to translate with this witness."  (Obj's 2.)  But given the presence of an interpreter at trial, the jury was clearly aware of the fact that Picon was not fluent in English, and thus could have concluded—as Petitioner urges—that it would have been impossible for Picon to testify to the substance of Petitioner and Nunez's alleged argument, which presumably would have been in English.

Petitioner may disagree with the way in which the jury weighed the evidence or with the credibility assessments that the jury made, but "assessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on habeas appeal."  *Garrett*, 438 F. Supp. 2d at 470 (alterations omitted) (quoting *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996)); *id.* at 470–71 (denying habeas petition based on an argument that a particular witness's testimony was "incredible" because "a habeas court must defer to the assessments of the weight of the evidence and credibility of the witnesses that were made by the jury" (quoting *Frazier v. New York*, 187 F. Supp. 2d 102, 109–10 (S.D.N.Y. 2002))); *see also Steinhilber v. Kirkpatrick, M.*, No. 18-CV-1251, 2020 WL 9074808, at *34 (S.D.N.Y. Aug. 21, 2020) ("[I]t is

well established that a weight of the evidence claim is based on state law and is not cognizable

on federal habeas review." (collecting cases)), *report and recommendation adopted sub. nom*,

*Steinhilber v. Kirkpatrick*, 2021 WL 12544554 (S.D.N.Y. Apr. 5, 2010).

Judge Davison's recommendation on this point is adopted.

### 5.  Ineffective Assistance of Trial Counsel

Petitioner argues that his trial counsel was ineffective for seven separate alleged failures,

as set out by Judge Davison: (1) failure to meet with and prepare witnesses; (2) failure to

investigate and prepare for trial; (3) failure to object to the search, seizure, and admission of

letters from Petitioner's jail cell; (4) failure to object to Green's appearance wearing an orange

jumpsuit at Petitioner's trial; (5) failure to object to prosecutorial misconduct during summation;

(6) failure to pay biennial dues; and (7) failure to preserve arguments for appeal.  (*See* R&R 40–

49; *see also* Pet'r's Suppl. Br. 5–6, unnumbered 40–41; Pet. ¶ 12.)

The Sixth Amendment of the United States Constitution provides that a criminal

defendant shall enjoy the right to effective assistance of counsel.  *See Bobby v. Van Hook*, 558

U.S. 4, 7 (2009) (per curiam).  A claim for ineffective assistance of counsel is analyzed under the

two-part test set out by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984): to

be entitled to relief, a petitioner must show that (1) his or her attorney's conduct was

constitutionally deficient because it fell below an "objective standard of reasonableness," *id.* at

687–88, and that (2) the petitioner was prejudiced by the ineffective representation—that is, but

for the deficiency, there is a reasonable probability that "the result of the proceeding would have

been different," *id.* at 694.

To determine whether counsel's conduct is deficient under the first prong, "the court

must determine whether, in light of all of the circumstances, the identified acts or omissions were

outside the wide range of professionally competent assistance." *Lindstadt v. Keane*, 239 F.3d 191, 198–99 (2d Cir. 2001) (alterations and quotation marks omitted).  Petitioner cannot meet this prong based solely on disagreements with counsel's strategy or advice.  Indeed, there is a "strong presumption" that counsel's conduct fell within the vast spectrum of reasonable assistance, and it is Petitioner's burden to demonstrate "that counsel's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986); *see also Bonilla v. Lee*, 35 F. Supp. 3d 551, 575 (S.D.N.Y. 2014) (same); *Henderson v. Martuscello*, No. 10-CV-5135, 2013 WL 6463348, at *15 (S.D.N.Y. Dec. 10, 2013) ("Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable, even where counsel adopts a course of action (or inaction) that seems risky, unorthodox[,] or downright ill-advised." (alteration and citation omitted)).  Thus, to satisfy this prong, Petitioner must demonstrate that his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687.  In assessing counsel's conduct, "a reviewing court must judge his conduct on the basis of the facts of the particular case, 'viewed as of the time of counsel's conduct,' and may not use hindsight to second-guess his strategy choices." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (citations omitted) (quoting *Strickland*, 466 U.S. at 490).

To satisfy the second prong, "[the petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding below would have been different." *United States v. Caracappa*, 614 F.3d 30, 49 (2d Cir. 2010) (quotation marks omitted).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.  "It is not enough for the defendant to show that the

errors had some conceivable effect on the outcome of the proceeding," as "[v]irtually every act

or omission of counsel would meet that test, and not every error that conceivably could have

influenced the outcome undermines the reliability of the result of the proceeding." *Id.* at 693.

"'[P]urely speculative' arguments about the impact of an error do not establish prejudice."

*DeCarlo v. United States*, No. 11-CV-2175, 2013 WL 1700921, at \*4 (S.D.N.Y. Apr. 17, 2013)

(alteration in original) (quoting *United States v. Weiss*, 930 F.3d 185, 199 (2d Cir. 1991)).

Moreover, "a court hearing an ineffectiveness claim must consider the totality of the

evidence . . . . [A] verdict or conclusion only weakly supported by the record is more likely to

have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S.

at 695–96.

Finally, the Supreme Court has instructed that "there is no reason for a court deciding an

ineffective assistance claim . . . to address both components of the inquiry if the [petitioner]

makes an insufficient showing on one." *Id.* at 697. The Court will analyze each of Petitioner's

claims of ineffective assistance in turn.

### a. Failure to Meet with and Prepare Witnesses

Petitioner first claims that he was denied effective assistance because his trial counsel

failed to call a series of witnesses: (1) a witness from Petitioner's bank, who apparently could

have testified that Petitioner's $10,000 withdrawal in December 2006 was used to finance a

legitimate business transaction, not Nunez's murder; (2) Shawn Weiss ("Weiss"), a DNA expert

from North Carolina that Petitioner had received court authorization to hire at public expense,

who could have rebutted evidence that Petitioner's DNA was found on the envelopes containing

the jailhouse letters; and (3) unidentified "other witnesses," who allegedly could have testified to

Petitioner's innocence or otherwise helped his case. (R&R 40–42.) Judge Davison determined

Petitioner could not make out a claim of ineffective assistance on this basis, observing at the

outset that "'[t]he decision not to call a particular witness is typically a question of trial strategy,'" and thus, "'is not ordinarily viewed as a lapse in professional representation'" sufficient to demonstrate ineffective assistance.  (*Id.* at 41 (quoting *Pierre v. Ercole*, 560 F. App'x 81, 82 (2d Cir. 2014)); *see also id.* ("'[C]omplaints of uncalled witnesses are not favored in federal habeas review.'" (quoting *Hodges v. Bezio*, No. 09-CV-3402, 2012 WL 607659, at *10 (E.D.N.Y. Feb. 24, 2012))).)  Judge Davison then concluded that (1) the bank witness would not have advanced Petitioner's case at trial, since, again, the prosecution did not argue that the $10,000 withdrawal was used to finance Nunez's murder, (2) it would have been reasonable for trial counsel to determine that Weiss's testimony may have been superfluous or even detrimental given the convincing evidence that Petitioner's DNA was present on the envelopes holding the jailhouse letters, and (3) that Petitioner's vague reference to "other witnesses" without any specific description of what testimony they may have offered was an attempt to rely on pure speculation.  (*Id.* at 41–43.)

Petitioner objects to each of these conclusions.  First, Petitioner appears to concede that the prosecution did not argue at trial that the $10,000 withdrawal was used to finance Nunez's murder, but claims that "[a]ctions and documents in evidence, 'speaks [sic] louder than words,'" and reargues that "[t]he bank employee" or various other individuals "could have swayed the Jury from believing that the money was used for criminal activity and tipped the scales in favor of Petitioner."  (Obj's 40–41.)  The Court does not agree.  Given that the prosecution did not use Petitioner's bank records to argue that Petitioner had used the $10,000 withdrawal to finance the murder, calling the witness that Petitioner describes would have at least been a waste of time. Petitioner's trial counsel could have also determined that calling a witness to testify about the withdrawal would have only drawn attention to the size of Petitioner's assets, supporting the

argument actually made by the prosecution that Petitioner had the financial wherewithal to finance the conspiracy.  *See United States v. Smith*, 198 F.3d 377, 386 (2d Cir. 1999) ("The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." (quoting *United States v. Eisen*, 974 F.2d 246, 265 (2d Cir. 1992))); *see also Perez v. United States*, No. 14-CV-3995, 2017 WL 1628902, at *8 (S.D.N.Y. May 1, 2017) (denying claim of ineffective assistance of counsel based on counsel's "strategic decision" not to call a witness whose testimony "would not have been helpful").

Second, Petitioner argues that his trial counsel's failure to utilize Weiss constituted ineffective assistance because "[t]here were [sic] no DNA on any of the (notes) or Petitioner's letter to counsel, according to the trial record, there was DNA on the (envelope)," thus, "[t]here's no evidence that indicates who actually wrote the notes."  (Obj's 41–42.)  This is simply not accurate.  As Judge Davison explained, the letters "referred to Petitioner and Green by name, referred to Petitioner's attorney by name, referred to [the County Court judge] by name, and discussed Petitioner's legal proceedings in detail."  (R&R 31.)  Moreover, the letters were found in Petitioner's jail cell hidden in his pillow, and witnesses testified that the letters matched his handwriting.  (*Id.* at 31; *see also, e.g.*, Trial Tr. 454:2–13 ("Q  Now, Mr. Nunez, during the course of knowing [Petitioner], have you had occasion to see his handwriting?  A  Yes  Q  I show you People's 24 for identification.  I ask you to open it and look at the contents inside and

tell me if you recognize the handwriting?  A  Yes, this is [Petitioner's] handwriting.").)[14, 15]

Finally, as Petitioner acknowledges, the envelopes in which certain of the letters were found had

Petitioner's DNA.  Given the ample evidence demonstrating that Petitioner did, in fact, write the

jailhouse letters, Petitioner's trial counsel's decision not to call a superfluous witness did not

constitute ineffective assistance.

  Finally, Petitioner argues that "[n]one of the defense witnesses would have been

superfluous or detrimental if trial counsel would have called them to testify," and that "there's no

speculation" since "one thing we now know for sure, is that since my witnesses weren't called,

look at my current status, the only thing detrimental [sic] was not calling them!"  (Obj's 42.)  To

the extent Petitioner is referring to the unspecified "other witnesses" Judge Davison considered

in the R&R, Petitioner's objections do not change the fact that a vague reference to "other

witnesses" cannot satisfy Petitioner's burden "to show that the state court applied [federal law] to

the facts of his case in an objectively unreasonable manner."  *Woodford*, 537 U.S. at 25; *see also*

*Perez*, 2017 WL 1628902, at *8 ("[Petitioner's] vague and unsupported assertions that unnamed

witnesses would have provided unspecific helpful testimony are wholly insufficient to make out

a prima facie case that counsel performed deficiently in failing to call these witnesses." (italics

omitted)).  Moreover, the fact of Petitioner's conviction (i.e., his "current status") cannot

constitute proof of ineffective assistance on its own, or every single conviction would necessarily

be the result of ineffective assistance.  *See Strickland*, 466 U.S. at 689 ("It is all too tempting for

---

  [14] While not dispositive, the Court notes that Petitioner has actually provided the Court with a number of handwriting samples in the form of handwritten letters to the Court, and Petitioner's handwriting is quite distinctive.  (*Compare, e.g.*, Dkt. No. 131 *with* Resp't's Opp'n Ex. 10.)

  [15] Respondent filed the full pre-trial hearing, trial, and sentencing transcripts in multiple sub-parts, across multiple docket entries.  (*See* Dkt. Nos. 90-14–90-32.)  When citing these transcripts, the Court will refer to the transcript's native page and line numbers.

a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court examining counsel's defense after it as proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort to be made to eliminate the distorting effects of hindsight[.]" (citation omitted)); *United States v. Garguilo*, 324 F.2d 795, 797 (2d Cir. 1963) ("A convicted defendant is a dissatisfied client, and the very fact of his conviction will seem to him proof positive of his counsel's incompetence.").

Petitioner cannot demonstrate that he was denied effective assistance of counsel based on his trial counsel's alleged failure to meet with and prepare witnesses; Judge Davison's recommendation on this point is adopted.

### b.  Failure to Investigate and Prepare for Trial

Petitioner next claims that he was denied effective assistance of counsel because his trial counsel "failed to investigate and prepare" for trial.  (*E.g.*, Pet. ¶ 12.)  Judge Davison concluded that this argument was meritless, noting that Petitioner had failed to state with specificity what his trial counsel allegedly failed to investigate, and that "a review of the record shows that counsel did, in fact, investigate and prepare for trial."  (R&R 43–44.)  Among other things, Judge Davison pointed to the fact that Petitioner's trial counsel was privately retained, and was actively involved in Petitioner's case from Petitioner's very first meeting with detectives the day after Nunez's murder up to and through Petitioner's sentencing.  (*Id.*)  Petitioner argues in the Objections that "[w]hat's not mentioned [in the R&R] is all the poor decisions made by trial counsel," and "[t]he fact that trial counsel was not court appointed means nothing," since "any and every attorney no matter if retained privately or court appointed, counsel is supposed to represent the client effectively."  (Obj's 42.)  Petitioner is absolutely correct that he—and every criminal defendant—is entitled to the effective assistance of counsel that is guaranteed by the

Sixth Amendment regardless of whether that counsel is retained privately or court appointed, but Petitioner misunderstands Judge Davison's point.  Judge Davison in no way suggested that because Petitioner chose to retain private counsel, his trial counsel was to be held to a lower standard.  Rather, Judge Davison noted the fact that Petitioner's trial counsel was retained and thus involved in Petitioner's case from even before Petitioner's arrest (whereas court-appointed counsel would not have become involved in Petitioner's case until after his arrest) as an illustration of the efforts Petitioner's trial counsel made to provide Petitioner with effective representation.

Petitioner appears to argue that his trial counsel made "poor decisions" because he failed to preserve certain claims for appeal.  (R&R 42–43.)  Petitioner has separately raised failure to preserve certain claims for appeal as an alternative ground for his claim of ineffective assistance, and this Court will address it below.  In any event, failure to preserve a claim for appeal does not constitute a "failure to investigate," and this Court agrees with Judge Davison that Petitioner's "failure to investigate" claim is meritless.

Judge Davison's recommendation on this point is adopted.

### c.  Failure to Object to the Search, Seizure, and Admission of Letters from Petitioner's Jail Cell

Petitioner claims that his trial counsel was ineffective for failing to object to the search, seizure, and admission of the letters obtained via the cell search on various grounds, including that the letters were privileged and the fruits of an illegal search and further that the introduction of the letters violated his Confrontation Clause rights.  (*See* Pet. ¶ 12; Pet'r's Suppl. Br. 5–6.)  Judge Davison rejected each of Petitioner's theories, concluding that the search was not illegal, the letters were not privileged, there was a sufficient foundation to introduce the letters, that the cell search warrant was valid, and that Petitioner's Confrontation Clause rights were not violated,

and thus that trial counsel's failure to raise any of these objections did not constitute ineffective assistance.  (R&R 44–46.)  Petitioner raises several objections to these findings.

First, Petitioner claims that his argument is not that the cell search itself was illegal, but rather "that during the cell search (the warrant itself was violated) according to the directions of the warrant specifying 'what' and 'what wasn't included.'"  (Obj's 43.)  As such, it appears that Petitioner does not object to Judge Davison's conclusion that the warrant itself was valid, but rather objects to Judge Davison's conclusion that the cell search was legal, because Petitioner claims that police violated the terms of the warrant in executing the cell search.[16]  Petitioner appears to argue that police violated the terms of the warrant because at least certain of the letters seized were in an envelope that "was addressed to counsel, sealed and marked 'legal mail,'" (Obj's 43), and the warrant specifically states that "[s]uch property to be seized . . . does not include any communication, including writings, correspondence, or mail, between [Petitioner] and his attorney," (Pet'r's Suppl. Br. at unnumbered 39).  The Court does not agree.  "The [Petitioner] cites no authority for the proposition that [envelopes] self-labelled as 'attorney-client privilege' are categorically immunized from cursory review during a search pursuant to a warrant.  Nor does [Petitioner] cite any authority for the proposition that materials can become privileged by the simple expedient of labelling them as such."  *United States v. Schulte*, No. 17-

---

[16] Petitioner argues that one of the facts cited by Judge Davison in support of his conclusion that the warrant application satisfied the *Aguillar/Spinelli* test was inaccurate. Specifically, Petitioner argues that Judge Davison's claim that "Avila had personally observed" conversations between Petitioner and Green, (R&R 46), was false, because "[d]uring Petitioner's entire time at the jail . . . Petitioner and Green were not allowed contact!", and "in order for Petitioner and Green to have had 'any conversation' there would certainly be a need for contact and so Avila also lied concerning this issue as well," (Obj's 44–45).  This argument is semantic. Avila told prosecutors that he passed letters and messages between Petitioner and Green—a claim which appears to be supported by the letters themselves, (*see* Resp't's Opp'n Ex. 10, at 139 ("Just have [Avila] see [Petitioner] at the hut A.S.A.P.!"))—and the word "observed" could easily be in reference to this activity.

CR-548, 2019 WL 5287994, at *3 (S.D.N.Y. Oct. 18, 2019) (citations omitted) (collecting cases); *see also Nat'l Day Laborer Organizing Network v. U.S. Immigr. & Customs Enf't*, 486 F. Supp. 3d 669, 689–90 (S.D.N.Y. 2020) ("[W]hile sometimes relevant, the label affixed to a document is not itself dispositive as to whether the privilege applies." (collecting cases)).  And, as Judge Davison concluded, the letters were clearly not privileged communications, which would have been obvious to the police executing the warrant upon even a cursory review.  Thus, the Court finds that the search warrant was not violated.

Second, Petitioner reasserts his argument that his Sixth Amendment Confrontation Clause rights were violated when the letters were introduced without either Avila or Avila's attorney being called to testify.  (*See, e.g.*, Obj's 12, 38–39.)  The Confrontation Clause bars the use of testimonial out-of-court statements offered against a defendant in lieu of in-court testimony subject to cross-examination.  While the Supreme Court has declined "to spell out a comprehensive definition of 'testimonial,'" it has explained that "at a minimum," the term applies to "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations."  *Crawford v. Washington*, 541 U.S. 36, 68 (2004); *accord DeJesus v. Perez*, 813 F. App'x 631, 633 (2d Cir. 2020) (summary order).  More broadly, statements are considered "testimonial" when they are "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."  *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310 (2009) (quotation marks omitted); *see also Michigan v. Bryant*, 562 U.S. 344, 354 (2011) ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a causal remark to an acquaintance does not." (quotation marks and alteration omitted)).  Petitioner's Confrontation Clause rights were not violated because no statement from Avila or his attorney

was admitted at trial at all, let alone a "testimonial" statement.[17]   The letters were not

authenticated at trial by a statement from Avila attesting to the fact that the letters were written

by Petitioner, rather, they were authenticated by, inter alia, DNA evidence, handwriting analysis,

and the substance of the letters themselves (which include identifiable references to Petitioner

and his case).

Because neither Petitioner's Fourth Amendment nor his Confrontation Clause rights were

violated, Petitioner's trial counsel was not ineffective for failing make the objections about

which Petitioner complains.  *See United States v. Regalado*, 518 F.3d 143, 149 n.3 (2d Cir. 2008)

("Failure to make a meritless argument does not amount to ineffective assistance." (alteration

and citation omitted)).  Judge Davison's recommendation on this point is adopted.

### d.  Failure to Object to Green's Appearance Wearing an Orange Jumpsuit at Petitioner's Trial

Petitioner argues that he was denied effective assistance of counsel based on his trial

counsel's failure "to adequately object to the prejudicial nature of having [Green] (who was not

on trial) brought into the courtroom in orange colored prison garb."  (Pet. ¶ 12.)  Judge Davison

concluded that because "the prosecution had to prove that Green was the killer in order to

establish Petitioner's role in procuring the crime," "[t]here is no real argument that Green's

identification was not relevant and admissible at Petitioner's trial, so there is also no basis for

Petitioner's contention that his attorney was derelict in not objecting to this evidence."  (R&R

---

[17] Elsewhere in the Objections, Petitioner refers to Avila as the prosecution's "principal witness," and argues that Avila "was a major and crucial part of Petitioner's case for the Prosecutor."  (Obj's 52, 53.)  This is plainly untrue, and Petitioner's inordinate focus on Avila throughout the Objections (and indeed, through all of the post-conviction proceedings) is inappropriate.  The prosecution called *33* witnesses in its case in chief, including three eyewitnesses to Green's murder of Nunez and multiple members of Nunez's family that Petitioner had attempted to coerce and bribe in an unsuccessful attempt to win Nunez back, and not including Avila.  Nor were any statements from Avila admitted at trial.  As such, Avila's credibility or lack thereof, reputation, and criminal history are simply irrelevant.

47.)  As for Green's attire, Judge Davison determined that "trial counsel may have reasoned that the visual contrast between Petitioner—on trial in street clothes—and Green in the telltale jumpsuit played well for Petitioner before the jury," and thus that this was "a strategic judgment which is immune from scrutiny under *Strickland*."  (*Id.*)  Petitioner objects to both conclusions.

First, Petitioner argues that "Green was not produced at trial for the purpose of being identified as the shooter," since "the Jury had already viewed Green, knew who he was and his charges," because "his trial took place prior to Petitioner's trial."  (Obj's 45.)  This is inaccurate. As Petitioner notes on the very same page of the Objections, "the [County Court] had granted separate trials," (*id.*), the purpose of which is to empanel different juries.  As such, the jury at *Petitioner's* trial had not already viewed Green, though if Green's trial took place prior to Petitioner's trial, the jury at *Green's* trial certainly would have.  Petitioner also argues that if "the contention used in this (R&R) is true that: Green was produced for the purpose of eyewitnesses identifying him, then the Prosecutor would have produced Petitioner at Green's trial as well." (*Id.*)  The Court does not agree with Petitioner's logic.  Petitioner and Green were both indicted and charged with Murder in the First Degree, which necessarily required the prosecution to prove that Petitioner and Green each was responsible for Nunez's murder.  There is no dispute that Petitioner did not pull the trigger, so—as Judge Davison explained—the prosecution had to prove that Green was the killer as a prerequisite to proving Petitioner's guilt.  The prosecution did so by presenting the testimony of eyewitnesses, who identified Green as the killer.  There would have been no purpose in presenting Petitioner at Green's trial for identification.

Second, Petitioner argues that "a picture paints a thousand words for the Jury," and thus it was a "poor 'strategic judgment'" for his trial counsel to allow Green to be presented in prison garb.  (*Id.*)  Petitioner argues that "it's obvious that the Prosecutor wanted Petitioner's Jury to

'know' that Green was convicted and pass judgment," and "[i]n any event, it was a high level of prejudice [sic]!"  (*Id.* at 45–46.)  However, Petitioner's objection is not at odds with Judge Davison's conclusion.  Judge Davison found that it would have been reasonable for Petitioner's trial counsel to believe that the jury seeing Green in prison garb (and thus perhaps assume that Green had been convicted, as Petitioner suggests) would benefit Petitioner's case.  The prosecution presented highly compelling evidence that Green was the shooter—Petitioner even concedes as much, (*see* Pet., Dkt. No. 1 at 20 ("There undoubtedly was sufficient evidence to demonstrate that . . . Green was the robber who killed . . . Nunez"))—so, as Judge Davison explained, Petitioner's trial counsel could have thought that drawing as much of a distinction between Petitioner and Green as possible was helpful.  This Court agrees that this was a strategic choice that is unchallengeable on habeas review.  *See Garguilo*, 324 F.2d at 797 ("It may well be that another attorney would have resolved these problems differently and that [the petitioner] would have profited by sounder advice[,] . . . [but] [the court is] not conducting a seminar in trial procedures, at least where the tactics involved are over those which conscientious attorneys might differ.").

### e.  Failure to Object to Prosecutorial Misconduct During Summation

Petitioner also claims that he was denied effective assistance of counsel because of his trial counsel's "[f]ailure to object to prosecutorial misconduct during summation."  (Pet. ¶ 12.) Judge Davison noted that "Petitioner fails to identify any such misconduct during summation" with respect to his ineffective assistance claim, and concluded that "a review of the prosecutor's summation does not show any misconduct."  (R&R 47–48.)  In the Objections, Petitioner refers to an episode at trial in which the prosecution apparently violated an order by the County Court by asking a witness about an incident of domestic violence between Petitioner and Nunez. (Obj's 46.)  Upon review of the trial record, it does appear that the prosecution asked a witness if

the witness was present when "[Petitioner] slapped [Nunez] in the face," but Petitioner's trial

counsel objected to that question, and the objection was sustained.  (Trial Tr. 779:9–13.)  And,

the prosecution made no reference to this incident in summation.  (*See id.* at 847:21–903:16.)

This Court agrees with Judge Davison that the prosecution's summation does not show any

misconduct, and thus, Petitioner's trial counsel was not ineffective for failing to object to it.  *See*

*Regalado*, 518 F.3d at 149 n.3 ("Failure to make a meritless argument does not amount to

ineffective assistance." (alteration and citation omitted)).  Nor is there any basis to grant the

Petition based on a single inappropriate question given that the County Court sustained trial

counsel's objection.

      Judge Davison's recommendation on this point is adopted.

### f.  Failure to Pay Biennial Dues

      Petitioner attached to his Petition an excerpt of a news article indicating that his attorney

may or may not have timely paid his biennial bar registration fees at the time of trial, and what

appears to be an email dated April 7, 2008 indicating that Petitioner's trial counsel was

"delinquent in filing his [bar] registrations for the 2006-07 & 2008-09 biennial periods."  (Pet'r's

Suppl. Br. at unnumbered 40–41.)  Judge Davison summarily dismissed this claim as "nothing

more than an ad hominem and completely irrelevant attack against his attorney," and "not rooted

in *Strickland*."  (R&R 48.)  In the Objections, Petitioner doubles down, arguing that "trial

counsel 'certainly' did not pay his biennial Bar <u>Registration Fees</u> on time" and analogizes the

situation to "a person operating an unregistered vehicle."  (Obj's 46.)  Petitioner then argues that

"[t]he news article further supports the fact that the Prosecutor relied extremely [sic] on the Jury

believing that Petitioner had used 'that' $10,000 check to pay for illegal activity," and makes a

series of other irrelevant accusations against the prosecution.  (*Id.* at 46–47; *see, e.g. id.* at 47

(suggesting that the prosecutor supplied the reporter with information as a "Beat You to the

Punch tactic").)  This Court agrees with Judge Davison that this is a gratuitous attempt by

Petitioner to malign his trial counsel, and not a legitimate basis for an ineffective assistance

claim.

Judge Davison's recommendation on this point is adopted.

### g.  Failure to Preserve Certain Arguments for Appeal

Finally, Petitioner argues that his counsel was ineffective for failing to preserve certain

arguments for appellate review.  (*E.g.*, Pet. ¶ 12.)  Judge Davison concluded that although the

Second Department noted that Petitioner's sufficiency of the evidence claim was "unpreserved

for appellate review," *Bowie*, 919 N.Y.S.2d at 894, because the Second Department went on to

consider the merits of the claim in the alternative, Petitioner failed to demonstrate that he was

prejudiced under *Strickland*.  (R&R 48–49).  While Petitioner restates in a conclusory fashion on

a number of occasions in the Objections that his trial counsel failed to preserve claims for

appellate review, (*see, e.g.*, Obj's 26, 34–35, 42–43), Petitioner lodges no specific objection to

Judge Davison's determination that Petitioner failed to demonstrate prejudice under *Strickland*.

The Court, upon review of the R&R, finds that "the factual and legal bases supporting" Judge

Davison's ruling on this claim "are not clearly erroneous or contrary to law." *Eisenberg*, 564

F. Supp. 2d at 226.

Judge Davison's recommendation on this point is adopted.  Thus, in sum, The Court finds

that Petitioner is not entitled to habeas relief on his claims of ineffective assistance of trial

counsel.

### 6.  Ineffective Assistance of Appellate Counsel

Petitioner claims that his appellate counsel was ineffective for failing to raise the

Confrontation Clause and ineffective assistance of trial counsel claims on appeal.  (*See* Pet.

¶ 12.)  Judge Davison rejected this claim, finding that because his Confrontation Clause and

ineffective assistance of trial claims were without merit, his appellate counsel had no obligation

to raise them, and moreover, that because Petitioner raised these issues in a pro se supplemental

brief which the Second Department considered in affirming Petitioner's conviction, Petitioner

was not prejudiced.  (R&R 49.)  Petitioner does not appear to object to this conclusion, and this

Court upon reviewing this portion of the R&R, finds that "the factual and legal bases supporting"

this finding "are not clearly erroneous or contrary to law."  *Eisenberg*, 564 F. Supp. 2d at 226.

Judge Davison's recommendation on this point is adopted.

### 7.  Prosecutorial Misconduct

Finally, Judge Davison rejected Petitioner's claim of prosecutorial misconduct as

procedurally barred, or in the alternative, meritless.  Judge Davison explained that "[t]he

appropriate standard of review for a habeas corpus claim alleging prosecutorial misconduct is the

narrow one of due process, and not the broad exercise of supervisory power.  The petitioner must

demonstrate that the alleged misconduct so infected the trial with unfairness as to make the

resulting conviction a denial of due process."  (R&R 50 (quoting *Williams v. Artus*, No. 11-CV-

5541, 2013 WL 4761120, at *12 (E.D.N.Y. Sept. 4, 2013)); *see also id.* ("A prosecutor's

misconduct cannot give rise to a constitutional claim absent 'egregious misconduct.'" (quoting

*Morris v. Kikendall*, No. 07-CV-2422, 2009 WL 1097922, at *15 (E.D.N.Y. Apr. 23, 2009))).)

Judge Davison found that none of Petitioner's allegations of prosecutorial misconduct—

including (1) that the prosecution mislead the jury by introducing his bank records into evidence,

(2) that he was prejudiced when the County Court admitted testimony about the potatoes found

both at the crime scene and in Petitioner's kitchen, (3) that Carabello and Deslandes'

identifications of Green as the shooter were equivocal or tainted by police coercion, (4) that

Petitioner was prejudiced by the testimony an investigator who explained the cell tower data,

(5) that the prosecution engaged in misconduct by contacting Avila, and (6) that the prosecution violated Petitioner's *Brady* rights by withholding the cashier's check—met this high bar.  (*Id.* at 50–53.)  Petitioner raises objections to certain of these conclusions, appearing to reassert his arguments that (1) the prosecution misled the jury by introducing Petitioner's bank records without the cashier's check, (2) evidence of the potatoes was irrelevant, and (3) the cell tower data was misleading.  (Obj's 48–50.)  The Court will address each of these objections in turn.[18]

First, Petitioner argues—again—that "the Prosecutor had 'concealed' <u>the check/information</u> from the Jury which prevented the Jury from reviewing the check as part of the evidence that could have convinced the Jury that, the Petitioner did not use his bank account for criminal activity."  (Obj's 48.)  This Court has already addressed Petitioner's claims regarding the check, *see supra* II.B.2.b, and rejects this claim for the same reasons.  Petitioner also argues that "the check was not in Petitioner's possession at the time [the prosecution] claims," (Obj's 50), presumably in opposition to Judge Davison's conclusion that Petitioner's *Brady* rights were not violated because the check was neither exculpatory nor withheld, (*see* R&R 52–53).  But Judge Davison's finding that the check was in Petitioner's possession at the time of trial was not dispositive, because Judge Davison also determined that the check was not exculpatory.  (*See id.*)  For all of the reasons previously stated, this Court agrees.

Second, Petitioner argues that "the potatoes had absolutely nothing to do with the crime or crime scene," since they are just "a vegetable that everyone has," and therefore that he was prejudiced by the introduction of testimony that pieces of potatoes were found at the crime scene

---

[18] As for the other claims of prosecutorial misconduct raised in the Petition and rejected by Judge Davison, the Court, upon review of the R&R, finds that "the factual and legal bases supporting" Judge Davison's ruling on these claims is "not clearly erroneous or contrary to law." *Eisenberg*, 564 F. Supp. 2d at 226.

and that potatoes were found in Petitioner's home. (Obj's 49.) This is simply a weight of the evidence challenge, which this Court has explained is not cognizable on habeas review. *See supra* II.B.4. Petitioner is correct that potatoes are a very common vegetable and that "[n]o testing or prints connected the potatoes to the Petitioner," but this information was also available to the jury, and it was up to the jury to determine what weight to assign to this evidence, if any. (Obj's 49.)[19]

Finally, Petitioner argues that the cell tower data introduced via the testimony of a police investigator was misleading because "[t]hey show a general area" in which Petitioner's home was also located, and thus, "the calls Petitioner made from home would hit off the same tower that service the crime scene area." (Obj's 50.) However, Petitioner explains in the very next sentence that the police investigator's "testimony had confirmed this during cross-examination at trial," (*id.*), and thus, this too is simply a weight of the evidence challenge that is not cognizable on habeas review, *see supra* II.B.4. Moreover, to the extent Petitioner is suggesting that the cell tower demonstrates that Petitioner was at his home at the time the crime was committed and that this constitutes an alibi, this suggestion is inapposite since, again, the prosecution's theory at trial was not that Petitioner was the shooter or even present at the crime scene.

In sum, Petitioner cannot demonstrate that the prosecution engaged in any misconduct, let alone misconduct egregious enough to "infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Williams*, 2013 WL 4761120, at *12 (quotation marks omitted). Judge Davison's recommendation on this point is adopted.

---

[19] Petitioner acknowledges that Green's signed confession states that Petitioner gave Green the murder weapon with a potato stuck onto the end of the barrel, but reasserts his argument that Green signed the confession under duress. (Obj's 49.) However, Green's confession was never introduced at Petitioner's trial, thus, it had no influence on the jury's verdict.

### III.  Conclusion

The Court, having conducted a thorough review of the remainder of the R&R, finds no error, clear or otherwise.  The Court therefore adopts the outcome of Judge Davison's R&R. Petitioner's writ of habeas corpus is accordingly dismissed with prejudice.

As Petitioner has not made a substantial showing of the denial of a constitutional right, a Certificate of Appealability shall not be issued, *see* 28 U.S.C. § 2253(c)(2); *Lucidore v. N.Y. State Div. of Patrol*, 209 F.3d 107, 111–12 (2d Cir. 2000), and the Court further certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this judgment on the merits would not be taken in good faith, *see Coppedge v. United States*, 369 U.S. 438, 445 (1962) ("We consider a [petitioner's] good faith . . . demonstrated when he seeks appellate review of any issue not frivolous."); *Burda Media Inc. v. Blumenberg*, 731 F. Supp. 2d 321, 322–23 (S.D.N.Y. 2010) (citing *Coppedge* and noting that "[a]n appeal may not be taken in forma pauperis if the trial court certifies in writing that it was not taken in good faith" (italics and quotation marks omitted)).

The Clerk of the Court is respectfully directed to enter judgment in favor of Respondent, send a copy of this Order to Petitioner at the address listed on the docket, and close the case. SO ORDERED.

Dated:   December 28, 2021
         White Plains, New York

_____
KENNETH M. KARAS
United States District Judge

60